FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ FEB 2 2006 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

HUMBERTO PEPIN TAVERAS,

          **Defendant.**

No. 04-CR-156 (JBW)

MEMORANDUM & ORDER
ON SUPPRESSION OF
DEFENDANT'S STATEMENTS
TO LAW ENFORCEMENT

JACK B. WEINSTEIN, Senior District Judge:

Defendant, accused of two murders prosecuted as capital crimes, moves for an order suppressing statements made to law enforcement personnel, as well as to Robinson Polanco, a fellow inmate who he maintains was acting as a police informant. The motion is denied.

I.    **Facts**

In the fall of 1999 defendant was convicted on federal charges of conspiracy to distribute heroin and cocaine, possession with intent to distribute heroin and cocaine, and bail jumping. He was sentenced to 151 months imprisonment. He was incarcerated at Otisville Federal Correctional Facility ("Otisville"), about two hours drive from New York City. Defendant appealed the conviction with the help of his attorney. While the appeal was pending, defendant discussed with this attorney the possibility of cooperating. The attorney advised defendant not to cooperate without his help. T. of Feb. 2, 2006 at 84:7-86:13.

Despite his appellate attorney's recommendation, in March 2002 defendant asked Robinson Polanco, a fellow inmate at Otisville, to contact New York City Police Department

1



Detective William Ahern, who was then assigned to the Queens Cold Case Squad. Polanco had previously cooperated with the Queens Cold Case Squad and had worked with Ahern in attempting to reduce his own punishment.

Polanco called Detective Ahern from Otisville, spoke briefly with him, and then handed the phone to defendant. This was the only time that defendant spoke to Ahern. Defendant expressed his desire "to talk to somebody" in order to help himself and asked to meet with the detective. Def. Ex. A., pp. 6, 8. Ahern responded that if defendant wanted to call his lawyer and find out when he could come up to Otisville and let the Queens Cold Case Squad know, then detectives from the Squad would come up and meet with defendant and his lawyer. *Id.* at 7. Ahern warned defendant, however, that "lawyers are very difficult" and that defendant would have to wait "a long time" if he wanted a lawyer to come up to Otisville to meet with Polanco and the police. *Id.* During the conversation with Ahern, defendant did not confess to any crimes, although he did suggest that he had information about a 1992 homicide in Yonkers, in which he and "three more guy[s]" were involved. *Id.* at 10.

Ahern told defendant that he would help him if he could and that "[i]f we can't help you we'll tell you we can't help and . . . you keep it a secret." *Id.* at 20. Two weeks later, Ahern began a vacation that lasted until he retired at the end of May 2002. He did not act on the information that defendant had given him, nor did he take notes during the conversation with defendant.

In April 2002 defendant asked Polanco to contact another law enforcement officer on his behalf: Detective Gary Darsarkissian, who was then working with the Federal Drug Enforcement Agency as part of the New York Drug Task Force. Gov. Ex. T-26, pp. 35-36. Darsarkissian told

2

defendant that if the body had in fact been dumped in Yonkers, he would contact the Yonkers Police Department about the case. T. of Feb. 2, 2006 at 20:17-21:4. When Darsarkissian learned that murder victim Rosario's body was discovered in Yonkers, he contacted the Yonkers Police Department and told Detective John Geiss that he had information about the murder. *Id.* at 18:3-9. Darsarkissian explained that he suspected defendant. *Id.* After verifying that there was an unsolved murder matching the D.E.A. agent's description, Geiss spoke with Darsarkissian again on April 29, 2002. *Id.* at 19:14-20. Geiss promptly made arrangements with the Otisville staff to visit defendant. Gov. Ex. 3500-JG-1 p. 2.

Detective Geiss and Detective William Gonzalez visited defendant at Otisville on May 8, 2002. T. of Feb. 2, 2006 at 22:7-9. Gonzalez, who speaks Spanish fluently, read defendant *Miranda* warnings in Spanish from a *Miranda* card and showed the card to defendant. Defendant was asked whether he understood each warning; he answered in the affirmative, but he refused to sign the card. When Geiss asked Defendant "if he wanted to continue to speak to [the detectives]," defendant answered that he did. *Id.* at 26:14-19. During this conversation, defendant stated that Rosario (also known as "Barrigita") was shot four times, and that three other people were present at the time. *Id.* at 27:4-13. He also stated that the body was cut up and that the pieces were placed in garbage bags and dumped. *Id.* He did not tell the officers who shot Rosario.

At the conclusion of the May 8 interview, defendant expressed concern that something might be added to the notes that Geiss had been taking in his notebook. Detective Gonzalez assured defendant that this would not occur. Defendant was then given the notes to review and was told that he could sign at the bottom, so that nothing could be added past that point. When

3

defendant then worried aloud that if he signed at the bottom, the notes would be construed as his written statement, Geiss and Gonzalez explained that his signature would not transform the notes into a confession. To further assure defendant, Gonzalez wrote, "You cannot use this against me later" on the document. Def. Ex. C. Defendant then wrote a statement of similar substance in Spanish and signed and dated the notes. *Id.* Before the detectives left Otisville, Geiss gave defendant his business card and told defendant that he could call the Yonkers detectives.

Defendant called the Yonkers detectives on June 6, 2002 and spoke with Detective Gonzalez. During their conversation defendant confessed to shooting Rosario four times and to killing Carlos Madrid, whose body was cut up and dumped in Queens. Defendant also told Gonzalez that he had an attorney by the name of Lawrence Gerzog who did not represent him at that time.

Defendant called the detectives again on June 11 and June 18, 2002. During these conversations, defendant informed the detectives that he used a kitchen knife to cut up Rosario and asked: "Do you want me to send you a . . . copy, more or less, of what the knives looked like?" Def. Ex. E. at 23:283. Gonzalez responded: "If you wish to send it." *Id.* at 23:384. Defendant then mailed Geiss a hand-drawn picture of the knife used to dismember Rosario. *See* Gov. Ex. L-12a. During these conversations defendant also stated that his ex-wife, brother-in-law, and first cousin were involved in both killings. Defendant called Geiss yet again on July 24, 2002 and Geiss informed defendant that he would visit him the following week.

On July 31 Geiss and Gonzalez met with defendant for a second time at Otisville. At the beginning of the meeting, Detective Gonzalez again read defendant *Miranda* warnings in Spanish and asked defendant if he understood them. Defendant answered in the affirmative and signed

4

and dated the *Miranda* card. During this interview, defendant again confessed to the shooting of Rosario, and implicated his ex-wife, brother-in-law and first cousin in the disposal of the bodies. Defendant told the detectives that he killed Rosario because Rosario was going to kill him. Defendant also described the killing of Carols Madrid, stating that he hit Madrid in the head with a hammer, dismembered the body and put the pieces in plastic bags, and disposed of the body in Queens.

During this conversation, defendant inquired of the detectives: "if you come to my . . . my prosecutor and stuff, assuming he doesn't want to work with me, what would you guys do in that case?" Gov. Ex. T-23 at pp. 51-52. Geiss responded: "I don't know. The D.A. is the one who's gonna do anything here. They will either prosecute this case or they're not gonna prosecute this case. I don't know what they're going to do. We have to show him that there is a case." *Id.* Later during that interview, Gonzalez warned the defendant:

> But just keep in mind, okay, that everything has to do with the District Attorney, whatever they decide that they want to do. Whether it's Federal, . . . whether it's Queens, whether it's our case. They . . . have the ultimate decision. And when you give them information, okay? You gotta give them good information that they can verify.

*Id.* at 66-67. Geiss added: "Remember . . . remember when we first met we told you we can't make any promises, we can't promise you anything?" *Id.* Gonzalez and Geiss again each emphasized "We can't promise you anything." *Id.*

Shortly after this meeting, on August 5, 2002, Geiss received an unsolicited letter from defendant in which he again confessed to the murder of Rosario. Defendant called Geiss on August 26, 2002 inquiring about the status of the investigation and Geiss told defendant to be

5

patient.

On October 15, 2002 Detectives Geiss and Gonzalez, along with Detective Oscar Hernandez and Detective Michael Carrano from the Queens Cold Case Squad, visited defendant at Otisville. Gonzalez once again read defendant *Miranda* warnings in Spanish. Defendant stated that he understood his rights and signed and dated the *Miranda* card. Defendant again confessed to the murders of both Rosario and Madrid. Geiss prepared a typed statement on his laptop computer of defendant's confession to the Rosario murder. The first paragraph, written in bold at the top of the statement, identified defendant and listed his contact information. The second paragraph, also in bold font, read:

> I am making this statement freely and voluntarily without any coercion, force, fear, favor, or consideration being given to me, nor promise being made to me to make this statement. I give this statement with the full knowledge that it may be used in a criminal action at some time in the future.

Gov. Ex. 25. Detective Gonzalez read the whole statement to defendant in Spanish. Defendant reviewed it and had small changes made in it before signing.

Geiss had informed the United States Attorney for the Southern District of New York of his ongoing investigation into the murders. In November 2002 Assistant United States Attorney Michael Kim informed Geiss that he would make no deals with defendant. This information was not relayed to defendant. Defendant called Geiss four more times before Geiss and Gonzalez went to see defendant for the third time at Otisville on January 15, 2003.

On January 15 the detectives again initiated the meeting by reading defendant *Miranda* warnings for the fourth time. Defendant indicated that he wanted to talk to them, and signed and dated the *Miranda* card. Defendant again confessed to the murders of Rosario and Madrid.

During this meeting, defendant signed photographs of the location where he disposed of Rosario's body and of a kitchen knife similar to the one he used to dismember Rosario. Defendant called and wrote several more letters to Detective Geiss thereafter.

In early July 2003 a Westchester County grand jury indicted defendant for Rosario's murder and on July 9, 2003 counsel was appointed for him. T. of Feb. 2, 2006 at 103:7-12. Defendant's new attorney, Allan Focarile, advised the defendant to stop talking to the police. *Id.* at 116:24-117:3. Despite Focarile's advice, defendant continued to contact law enforcement officials. Defendant again called Geiss on July 14. Geiss informed defendant that he could no longer speak with him because he had an attorney. Nonetheless, they continued the conversation. The next day defendant called Gonzalez, who told defendant the same thing Geiss had said. The government has indicated that it does not intend to rely on any of defendant's post-indictment phone calls to law enforcement during its case-in-chief.

A grand jury in this district indicted defendant for the drug-related murder of Madrid in February 2004. The grand jury subsequently returned a superseding indictment that added a count against defendant for the drug-related murder of Rosario. The Westchester District Attorney's Office then dismissed its case against defendant.

Defendant wrote to Southern District of New York Assistant United States Attorney Richard Sullivan in May 2004 asking for an opportunity to discuss his crimes with him. In this letter defendant indicated that he had been speaking with yet another law enforcement agent, a "Timmahony" from New Jersey, for six months. Gov. Ex. L-9a. Defendant also wrote a similar letter in June 2004 to New York City Police Department Detective Brancini, who was then assigned to the Brooklyn Cold Case Squad. *See* Gov. Ex. L-18a. Luis Diaz, an inmate at the

Manhattan Correctional Center also contacted Detective Brancini by mail in June 2004 on defendant's behalf at defendant's request. *See* Gov. Ex. L-19a.

## II. Law

Defendant argues that his statements to Robinson Polanco and to the detectives should be suppressed because they occurred in violation of his Fifth and Sixth Amendment rights to counsel. The government counters that the evidence should be admitted because the defendant's constitutional rights have not been violated.

### A. Sixth Amendment

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Defendant asserts that this right to counsel attached under New York State law before any statements were made to detectives. Under New York law, a defendant who is in custody for a crime for which he has counsel, may not, in the absence of his attorney, waive the right to counsel, even if the police seek to question him about an unrelated crime. *People v. Burdo*, 91 N.Y.2d 146 (1997).

Federal law governs this court's assessment of the defendant's right to counsel. *See State v. Pforzheimer*, 826 F.2d 200, 203 (2d Cir. 1987); *United States v. Turner*, 558 F.2d 46, 49 (2d Cir. 1977) (federal law applies in a federal case, even where the evidence is obtained in violation of state law). Under federal law, the right to counsel "is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal

charge, preliminary hearing, indictment, information, or arraignment.'" *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 2297 (1984) (citations omitted)). The Supreme Court has explicitly held that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 176, 111 S.Ct. 2204, 2208 (quoting *Maine v. Moulton*, 474 U.S. 159, 180, n. 16, 106 S. Ct. 477, 489 (1985).

Once a defendant's Sixth Amendment right has attached, he is protected from statements made to government agents in the absence of his attorney. *See Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199 (1964) (holding that undercover agents could not obtain information from an individual whose Sixth Amendment right to counsel had attached); *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 487 (1985) ("the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent"); *United States v. Henry*, 447 U.S. 264, 270, 100 S. Ct. 2183, 2186 (1980) (holding that the government had "deliberately elicited incriminating statements from [defendant] within the meaning of *Massiah*" when an informant who was also an inmate testified about conversations conducted with defendant in prison, even though the informant did not initiate the conversations (internal quotation marks omitted)).

## B. Fifth Amendment

The Fifth Amendment provides: "No person shall . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has held that, as a prophylactic measure, if a suspect undergoing custodial interrogation states that he wants an attorney, the interrogation must cease until an attorney is present. *Miranda v. Arizona* 384 U.S. 436, 86 S. Ct. 1602 (1966). *See also Fare v C.* 442 U.S. 707, 99 S. Ct. 2560 (1979), reh. den., 444 U.S. 887, 62 100 S. Ct. 186 (explaining that the right to counsel required by *Miranda* is based on the unique ability of an attorney to protect the Fifth Amendment rights of a client undergoing custodial interrogation). Under *Miranda* "a suspect must be apprised of his rights against compulsory self-incrimination and to consult with an attorney before authorities may conduct custodial interrogation." *Texas v. Cobb*, 532 U.S. 162, 171, 121 S. Ct. 1335, 1342 (2001).

To trigger the right to counsel under the Fifth Amendment, "the suspect must unambiguously request counsel. . . . [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States* 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994) (law enforcement agents were not required to stop questioning a suspect after he made the ambiguous remark, "Maybe I should talk to a lawyer"). A suspect who invokes the Fifth Amendment right to counsel cannot be subject to any further police-initiated questioning regarding any offense unless an attorney is present. *See id.*; *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880 (1981).

Once it is established that a suspect actually invoked the right to counsel during custodial interrogation, the suspect's responses to further questioning may be admitted at trial only if it is found that the suspect "(1) initiated further discussions with the interrogating officers, and (2) knowingly and intelligently waived the right [to counsel] he had [previously] invoked." *Smith v. Illinois*, 469 U.S. 91, 95 105 S. Ct. 490, 493 (1984) (citations omitted). *See also Oregon v. Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830 (1983) (requiring that a suspect knowingly and intelligently waive the Fifth Amendment right to counsel during custodial interrogation after initially invoking the right).

## III. Application of Law to Facts

### A. Defendant's Statements to Robinson Polanco and to Detective Ahern and Defendant's Post-Indictment Statements to Law Enforcement

At the February 16, 2006 hearing, the government indicated that it would not seek to admit any statements defendant made to Robinson Polanco unless the court suppressed the defendant's post-*Miranda*, pre-indictment statements to law enforcement personnel. The government also indicated that it would not seek to admit any statements that defendant made to Detective Ahern or any statements defendant made to law enforcement agents after he was indicted in July 2003.

Because defendant's post-*Miranda*, pre-indictment statements to law enforcement officials are not suppressed, *see infra* III.B, the court does not now decide whether defendant's statements to Polanco, Ahern, or any law enforcement officer post-indictment are admissible. Should the government later seek to admit these statements, the court will then rule on any

11

renewed motion to suppress.

### B. Defendant's Other Pre-Indictment Statements to Law Enforcement

Statements made to law enforcement personnel other than Ahern before defendant's indictment in July 2003 are not suppressed because there was no violation of defendant's Fifth or Sixth Amendment rights.

Prior to the defendant's July 2003 indictment, his Sixth Amendment right to counsel had not attached. His statements to law enforcement were unrelated to the drug charges for which he had been appointed counsel and on which an appeal was pending. Statements made while defendant was represented in a pending unrelated crime are not excludable. *See, e.g., United States v. Moran*, 475 U.S. 412, 430, 106 S. Ct. 1135, 1146 (1985); *United States v. Roberts*, 869 F. 2d 70, 73 (2d Cir. 1989).

Defendant's Fifth Amendment rights were not violated. Defendant gave information to the police freely, voluntarily and after he was aware of his right to counsel, which he deliberately and advisedly waived. None of the information received from him by the police is tainted in any way. Defendant spoke and understood English and was not misled in any way by his English- or Spanish-speaking interlocutors. Defendant never requested an attorney.

Defendant was extraordinarily anxious to tell all he knew about his grisly crimes on the supposition that his revelations would gain him some advantage. The police did not try to induce him to speak, nor did they need to do so.

Detective Ahern did not discourage defendant from consulting an attorney but, in effect, informed defendant that he would not travel up to the prison to meet with an attorney at the

\*\*\*\*\*\*\*\*\*\*\*\*\* -COMM. JOURNAL- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE FEB-22-2006 \*\*\*\*\* TIME 16:42 \*\*\*\*\*\*\*\*

```
MODE = MEMORY TRANSMISSION        START=FEB-22 16:26    END=FEB-22 16:42

   FILE NO.=374

STN NO.   COMM.   ABBR NO.   STATION NAME/TEL NO.   PAGES      DURATION

  001     OK        a        912129644506           015/015    00:02:12
  002     OK        a        912129629696           015/015    00:02:27
  003     OK        a        917182546479           015/015    00:02:35
```

                                                       -HON.JACK B. WEINSTEIN   -

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* -JBW      - \*\*\*\*\* -    1 718 260 2527- \*\*\*\*\*\*\*\*



Jack B. Weinstein
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

Tel: (718) 613-2520
Fax: (718) 613-2527

TO:   David L. Lewis    ~ (212) 964-4506
      Louis Freeman     ~ (212) 962-9696
      Lee Freedman      ~ (718) 254-6479

DATE: February 22, 2006                           # PAGES WITH COVER: 15

RE:   Memorandum & Order on Suppression of Defendant's Statements to Law
      Enforcement – *United States v. Pepin*, 04-CR-156 (JBW).

   Please distribute. This order will also appear on the ECF system shortly.
   Please contact law clerk Christopher Wimmer at (718) 613-2524 if you believe
   this distribution list should be altered.

prison because it was unlikely (as was probably true) that an attorney would make himself available for a conference at the prison, which was located a considerable distance away from New York City, the likely place of his office. In any event, defendant's contact with Ahern is fully attenuated from his contact with other law enforcement officers. Ahern retired shortly after speaking with defendant and did not act on defendant's statements.

When defendant was unsatisfied with Ahern's response, he contacted Darsarkissian and insisted on a meeting. When Geiss and Gonzalez met with defendant, he was advised appropriately of his *Miranda* rights before he gave any incriminating evidence. He insisted on talking to the police after being re-advised of his rights, despite the sound counsel of his attorney that he stop talking. He sent officers unsolicited confession letters and voluntarily called the police to confess ever more details of his crimes. He also insisted on meeting with the police in person repeatedly. So desperate was he to become a friend of the police that he sought to cooperate with various independent state authorities in New York and New Jersey. Nothing short of a piece of duct tape across his lips could have kept defendant from confessing over and over again.

The police never advised defendant directly or indirectly that they would assist him or that his revelations would lead to any assistance from any prosecuting authority. They specifically informed him that they could not make any promises, and that the power to make a deal lay entirely in the hands of the prosecutor. Defendant understood that he might be prosecuted for the murders to which he confessed: he asked Geiss and Gonzalez what would happen if the prosecutor did not want to make a deal with him.

The police, who testified at the evidentiary hearings in this court, were credible. They were telling the truth. The affidavit of defendant, dated December 31, 2005, insofar as it conflicts with evidence offered by the prosecution, is not credible.

This memorandum embodies the court's findings of fact and law after a full evidentiary hearing.

## IV. Conclusion

Defendant's motion to suppress is denied.

SO ORDERED.

*Jack B. Weinstein*

Jack B. Weinstein

Dated: February 22, 2006
      Brooklyn, New York