**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

---

|                                   |     |                         |
| --------------------------------- | --- | ----------------------- |
|                                   | )   |                         |
| UNITED STATES OF AMERICA          | )   | No. 04-CR-156 (JBW)     |
|                                   | )   |                         |
| v.                                | )   | OMNIBUS PRETRIAL        |
|                                   | )   | MEMORANDUM AND ORDER    |
| HUMBERTO PEPIN TAVERAS,           | )   |                         |
|                                   | )   |                         |
| **Defendant.**                    | )   |                         |
|                                   | )   |                         |

---

APPEARANCES:

For the United States:
    United States Attorney's Office
    Brooklyn, New York
    By:    Lee Freedman
            Morris Fodeman

For Defendant:
    Freeman, Nooter & Ginsberg         Lewis & Fiore
    New York, New York                New York, New York
    By:    Louis Freeman          By:    David Lewis

## TABLE OF CONTENTS

I.     Introduction.................................................................................................3

II.    Proposed Superceding Indictment Under Title 18 Capital Sentencing Procedures Instead of Former Title 21 Capital Sentencing Procedures............................................3

     A.    Facts...............................................................................................4

     B.    Effect of Repeal of Title 21 Capital Procedures.....................................5

     C.    Ex Post Facto Prohibition.................................................................7

     D.    Title 18 Provisions Are Not More Onerous Than Those of Title 21.......8

          1.    Jury Sentencing..................................................................9



|   | 2. | Evidentiary Standards | 12 |
|---|----|----|----|
|   | 3. | Jury Instructions | 14 |
|   | E. | Ruling on Re-Indictment | 15 |
| III. | | Proposed Amendment of Death Notice to Allege Child Endangerment | 15 |
| IV. | | Reciprocal Discovery and Notice of Mitigating Factors | 16 |
| V. | | Attorney-Conducted Voir Dire | 18 |
| VI. | | Limiting Press Access to Voir Dire | 19 |
|   | A. | Distribution of Blank Jury Questionnaires | 20 |
|   | B. | Presence During Voir Dire | 21 |
|   | C. | Presence During Hardship Applications | 21 |
| VII. | | Prospective Jurors' and Witnesses' Addresses | 22 |
| VIII. | | Presence at Sidebars | 26 |
| IX. | | Admission of Prior Testimony | 26 |
|   | A. | Unavailability | 27 |
|   | B. | Prior Cross-Examination | 30 |
| X. | | Exclusion of Unduly Prejudicial Evidence at Penalty Phase | 33 |
|   | A. | Prejudice and Probative Value: Guilt Phase | 37 |
|   | B. | Prejudice and Probative Value: Penalty Phase | 38 |
|   | C. | Exclusion of Post-Mortem Evidence | 41 |
| XI. | | *Daubert* Hearing on Expert Evidence of Future Dangerousness | 41 |
| XII. | | Conclusion | 43 |

JACK B. WEINSTEIN, Senior United States District Judge:

## I.      Introduction

In this action the government seeks a death sentence against defendant for the murder of two of his drug dealing associates committed during their drug conspiracy. At a series of pretrial hearings a number of motions were made by the parties. They are discussed and decided below.

In a matter of first impression, the court first considers the application of the ex post facto clause in capital drug cases following Congress' elimination of special capital drug crime procedures. *See* Part II, *infra*.

## II.     Proposed Superceding Indictment Under Title 18 Capital Case Procedures Instead of Former Title 21 Capital Case Procedures

The original indictment in this prosecution was based upon capital case procedures found in title 21 of the United States Code. *See* 21 U.S.C. § 848(h)-(n). Title 21 deals with drug offenses. The government proposes to recharge under title 18 capital case procedures. *See* 18 U.S.C. § 3591 *et seq.* Title 18 deals with crimes and criminal procedure generally.

Defendant contends that this shift in procedures would constitute a violation of the ex post facto clause of the United States Constitution. *See* U.S. Constit. Art. I § 9 cl. 3. As indicated below, defendant's claim is rejected. The government may supercede and prosecute using the general case procedures of title 18.

## A.  Facts

Count One of the present indictment reads as follows:

> On or about September 17, 1992, within the Eastern District of New York and elsewhere, the defendant HUMBERTO PEPIN TAVERAS, also known as "Tony" and "Luis Rosario," while engaged in an offense punishable under Section 841(b)(1)(A) of Title 21 of the United States Code, to wit: conspiracy to distribute and possess with intent to distribute one or more controlled substances, which offense involved (a) five kilograms or more of a substance containing cocaine, a Schedule II controlled substance, and (b) one kilogram or more of a substance containing heroin, a Schedule I controlled substance, did knowingly and intentionally kill and cause the intentional killing of another person, to wit: Jose Rosario, also known as "Barrigita," and such killing did result.
>
> (Title 21, United States Code, Section 848(e)(1)(A); Title 18, United States Code, Sections 3551 et seq.)

Super. Indict. 1-2. Count Three charges defendant with the same conduct in connection with the

1995 murder of Carlos Madrid.  Count Two has already been stricken for violation of the ex post

facto clause.  *See United States v. Taveras*, 401 F. Supp. 2d 304 (E.D.N.Y. 2005).

Section 848(e)(1)(A) of title 21—the referent in the indictment—reads:

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death . . .

21 U.S.C. § 848(e)(1)(A).  Section 841(b)(1)(A) criminalizes possession with intent to distribute

more than a kilogram of heroin and more than five kilograms of cocaine.  21 U.S.C. §

841(b)(1)(A)(i)-(ii).  Conspiracy to possess is punished as actual possession.  21 U.S.C. § 846.

Prior to March 9, 2006, a defendant charged with capital murder under section 848(e) was

prosecuted under capital case procedures set forth in sections 848(h)-(n) of title 21.

On March 9, 2006 Congress repealed the capital case procedures under section 848 of title 21 (the "Anti-Drug Abuse Act," or "ADAA"). *See* Pub. L. 109-177, § 221 (repealing subsections 848(g) through (p), (q)(1)-(3), and (r)). Nothing in the legislative history indicates the purpose of the repeal. *See* H.R. Rep. No. 109-174 (2005) (no mention of changes to death penalty procedures). Yet the purpose of the elimination of special title 21 capital case provisions for drug cases in favor of title 18 procedures applicable to all capital crimes was—it may be safely assumed—to rationalize and simplify federal criminal procedure. A single trans-subtantive procedure applying to all capital cases results in easier amendment, more precise and fuller case law development, and more uniform practice in the complex area of capital prosecutions. It is a simplification easily justified and should be welcomed by bench and bar.

After this repeal, sections 3591 *et seq.* of title 18 (the "Federal Death Penalty Act," or "FDPA") are the only source of capital procedures in the federal code. It is defendant's position that re-indictment and prosecution under title 18 would violate the ex post facto clause because the crimes alleged predate FDPA's enactment and because the change in procedures would impair his substantive rights.

## B.    Effect of Repeal of Title 21 Capital Procedures

Repeal of the title 21 ADAA capital case procedures does not free defendant from potential liability for the charged crimes. *See* 1 U.S.C. § 109 ("The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide . . . ."). The substantive offense, murder during the course of a drug conspiracy, remains in effect. *See* 21 U.S.C. § 848(e)(1)(A).

5

Nor would re-indictment expose defendant to liability for any new crime.

The basic issue posed by the parties is whether the change should be characterized as strictly procedural, not subject to ex post facto objection.

Subsection (a) of section 3591 of title 18 permits the government to seek the execution of a person who has been convicted of: "(1) an offense described in section 794 or section 2381; or (2) any other offense for which a sentence of death is provided . . . ." 18 U.S.C. § 3591(a). Clause (1) refers to statutes penalizing delivery of defense information to aid a foreign government, and treason. Clause (2) refers to all other crimes for which a sentence of death is provided, including defendant's alleged drug-related crimes.

The statute under which defendant is now charged, section 848(e) of title 21, provides:

> . . . any person engaging in an offense punishable under section 841(b)(1)(A) of this title . . . who intentionally kills . . . or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death . . . .

21 U.S.C. § 848(e)(1)(A).

Defendant is charged with committing two murders while engaged in a conspiracy to possess and possess with intent to distribute cocaine and heroin, a violation of section 841(b)(1)(A). *See* Part II.A, *supra.* By its terms, section 3591 of title 18 dealing with "Sentence of death" generally now applies to the current prosecution, the more specific capital case procedures for drug crimes having been eliminated.

## C.     Ex Post Facto Prohibition

Clause 3 of Section 9 of Article I of the United States Constitution declares, "No Bill of

Attainder or ex post facto Law shall be passed." This prohibition includes:

> 1st. Every law that makes an action, done before the passing of the law, and which
> was innocent when done, criminal; and punishes such action. 2nd. Every law that
> aggravates a crime, or makes it greater than it was, when committed. 3rd. Every
> law that changes the punishment, and inflicts a greater punishment, than the law
> annexed to the crime, when committed. 4th. Every law that alters the legal rules
> of evidence, and receives less, or different, testimony, than the law required at the
> time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3 U.S. 386, 390 (1798). *See also Dobbert v. Florida*, 432 U.S. 282, 292, 97 S. Ct.

2290 (1977) (describing as ex post facto "any statute which punishes as a crime an act previously

committed, which was innocent when done; which makes more burdensome the punishment for a

crime, after its commission, or which deprives one charged with crime of any defense available

according to law at the time when the act was committed" (citing *Beazell v. Ohio*, 269 U.S. 167,

169-170, 46 S. Ct. 68 (1925)).

The fundamental protection afforded by the ex post facto clause is the right of a person to

be on fair notice of the consequences of his actions before he acts. Because of the violation of

this clause, the court dismissed in the instant case a count of the indictment charging defendant

with capital murder by firearm during a narcotics conspiracy under a law enacted after the alleged

murder, but before the termination of the underlying conspiracy. *See United States v. Taveras*,

401 F. Supp. 2d 304 (E.D.N.Y. 2005).

The ex post facto clause does not confer "a right to be tried, in all respects, by the law in

force when the crime charged was committed." *Dobbert*, 432 U.S. at 293 (quoting *Gibson v.

Mississippi*, 162 U.S. 565, 590, 16 S. Ct. 904 (1896)). "The constitutional provision was

intended to secure substantial personal rights against arbitrary and oppressive legislation, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Id.* (quotations and alterations omitted). "Even though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." *Id.* This retrospective application of procedural changes does not abandon a defendant to the whims of the legislature; the new procedures must still meet basic requirements of fairness. *See Coleman v. McCormick*, 874 F.2d 1280, 1286 (9th Cir. 1989) (ex post facto clause permits retrospective application of procedural law, but due process clause requires that the procedures applied be "fundamentally fair").

### D.     Title 18 Provisions Are Not More Onerous Than Those of Title 21

The distinction between substantive and procedural law is a shifting one, depending upon context. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427-429, 116 S. Ct. 2211 (1996) (reviewing the Supreme Court's changing analysis of the procedural-substantive distinction). However characterized, the changed capital procedures, and their application to this defendant, would not violate the ex post facto clause.

"It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." *Dobbert* at 294. A court "must compare the two statutory procedures in toto to determine if the new may be fairly characterized as more onerous." *Id.* Though title 18's FDPA may be, in some respects, more burdensome than title 21's ADAA, it is on the whole beneficial to defendant.

## 1.    *Jury Sentencing*

Under the title 21 ADAA procedures, the jury, after weighing aggravating and mitigating factors, decided simply whether the death penalty was to be imposed.

> [T]he jury . . . shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence.

21 U.S.C. § 848(k) (repealed).

Although on its own this language does not command the conclusion that the jury decided only whether to impose the death penalty, the subsection following it strongly suggests that, where death was not recommended by the jury, it was the court that decided the length of incarceration. "Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law." 21 U.S.C. § 848(l) (repealed).

This ambiguity about who imposed a sentence other than death had earlier occasioned debate between the parties. Defendant sought a charge that informed the jury that, if not sentenced to death, he would spend the rest of his life in prison. In so doing he sought to allay jurors' potential fear that, if not executed, he would be released in short order. The government countered that this proposed charge was inappropriate, since life imprisonment without parole was not the only other sentencing option.

By contrast, under the title 18 FDPA procedures, the jury is explicitly entrusted with the determination of a defendant's sentence. After weighing the aggravating and mitigating factors,

9

"the jury by unanimous vote . . . shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." 18 U.S.C. § 3593(e).

Defendant contends that the application of title 18's FDPA would "change[] the punishment, and inflict[] a greater punishment, than the law annexed to the crime, when committed," *Calder v. Bull*, 3 U.S. at 390, because a jury recommendation of life imprisonment is binding on the court. Under the previously applicable title 21 ADAA procedures, such a recommendation would arguably not be binding. *Compare* 18 U.S.C. § 3594 ("Upon a recommendation [by the jury] that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly. Otherwise, the court shall impose any lesser sentence that is authorized by law.") *with* 21 U.S.C. § 848(l) (repealed) ("Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law.").

Defendant's present argument sits uneasily with his earlier requests for a jury charge under title 21's ADAA that, if he is not executed, he will spend the rest of his life in prison. He has, until the issue of re-indictment arose, maintained that the only practical alternative to death for him is life imprisonment without possibility of release; he has requested the court to rule on several points as though that were the case. But inconsistency in a single defendant's argument does not affect general statutory interpretation.

This issue is largely a theoretical one. If convicted and not sentenced to death, defendant is subject to a 20-year minimum sentence on each of the two capital charges. 21 U.S.C. § 848(e).

10

If he were to behave in exemplary fashion during his incarceration, he could receive up to 54 days credit towards the completion of his sentence each year. *See* 18 U.S.C. § 3624. If he were to receive full credit possible for each year he was imprisoned, and if the court were to impose the minimum sentence on the two charges to run concurrently, he would serve 17 and a half years. Since the two murders alleged are separated by several years, consecutive sentences might be appropriately imposed, yielding a minimum sentence of 40 years, with good credit providing a minimum time served of 35 years.

A Guidelines sentence on either murder would be life imprisonment. *See* U.S.S.G. § 2A1.1 and commentary.

A 42-year-old Hispanic male, defendant's remaining life expectancy is 30 years. *See* Centers for Disease Control, U.S. Decennial Life Tables for 1989-1991 (1997), Table 8 ("Life table for males other than white"). Life expectancy within federal prison is considerably shortened. *See* John J. Gibbons & Nicholas de B. Katzenbach, *Confronting Confinement* 11 (June 2006) (discussing persistent problems in United States penitentiaries of "prisoner rape, gang violence, the use of excessive force by officers, [and] contagious diseases"). Defendant's life expectancy is thus less than the time he would probably serve if convicted of the murders. *Cf. United States v. Tocco*, 135 F. 3d 116, 131-132 (2d Cir. 1998) (upholding sentence in excess of defendant's life expectancy where, taking into account good-time credits that could be earned, defendant might be released before death). If convicted and not executed, it is almost certain that he will die in prison. Prejudice from the procedural change in the instant case is de minimis. The law need not ignore the practical realities of the world.

A substantial benefit to defendant may in fact accrue from elimination of title 21's ADAA. Empirical research suggests that the risk to society if a defendant is ever released is one of the most significant factors juries rely on when choosing to impose the death penalty. *See* Ursula Bentele & William J. Bowers, "How Jurors Decide on Death," 66 Brook. L. Rev. 1011, 1067-1069 (Table I). Under title 18's FDPA, the jury would be aware that it has plenary power to determine defendant's sentence. It is thus less likely that they will choose to impose the death penalty out of fear of his early release.

### 2. *Evidentiary Standards*

The change to title 18's FDPA favors defendant in another significant sense: it raises the bar for admission of prejudicial evidence at sentencing. Under title 21's ADAA, evidence was only to be excluded at sentencing if "its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury." 21 U.S.C. § 848(j) (repealed) (emphasis supplied). This echoes the language of Federal Rule of Evidence 403. *See* Fed. R. Evid. 403. By contrast, under FDPA, evidence may be excluded if "its probative value is *outweighed* by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c) (emphasis supplied). *See United States v. Taveras*, 424 F. Supp. 2d 446, 453 (E.D.N.Y. 2006) (citing *United States v. Sampson*, 335 F. Supp. 2d 166, 177 (D. Mass. 2004) (noting that FDPA provides for exclusion of more evidence than Rule 403)). The change to title 18's FDPA has already resulted in exclusion of damaging evidence against defendant. *See* Part X, *infra.*

12

This statutory change also raises the bar for admission of mitigating evidence. *See* 18 U.S.C. § 3593(c) (permitting the court to exclude both aggravating and mitigating information). But prejudice against a capital defendant is more likely than prejudice against the government, so that a rule favoring exclusion tends to be a pro-defendant rule. For example, aggravating evidence that defendant has previously physically and sexually abused a child may prejudice a defendant by tending to lead to the imposition of the death penalty on a basis outside of the "channeled" discretion required by the Constitution. *Gregg v. Georgia*, 428 U.S. 153, 206, 96 S. Ct. 2909 (1976). By contrast, it is difficult to conceive of how mitigating evidence could be unduly prejudicial to the government. Admission of all mitigating evidence—even that which is only marginally relevant to defendant's character or the offense—is constitutionally required. With certain possible exceptions not relevant here, a capital sentencing body must "not be precluded from considering, as a mitigating factor, *any aspect* of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954 (1978) (plurality opinion) (emphasis removed; emphasis supplied). It is perhaps for this reason that the court could find no reported case where a trial court excluded evidence offered in mitigation under FDPA on the grounds that it was more prejudicial than probative.

This differential treatment of mitigating and aggravating factors to favor defendants is consonant with the priority accorded to mitigating factors in the Supreme Court's Eighth Amendment jurisprudence. *See United States v. Taveras*, 424 F. Supp. 2d at 450 (detailing preference for mitigating factors in capital cases under Supreme Court precedent). Rulings on exclusion of penalty phase evidence will reflect this approach, though the government will be

13

permitted to rebut information proffered by defendant.

### 3.    Jury Instructions

Title 21's ADAA provided for jury instructions that arguably better protect defendant's life by informing the jury of its power to impose a sentence other than death. ADAA made explicit that the jury was never required to impose a death sentence. *See* 21 U.S.C. § 848(k) (repealed) ("The jury . . . regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed."). FDPA, on its face, does not offer this option to the jury. Its provision on recommendation of sentence provides that, if the defendant's intent has been proven beyond a reasonable doubt:

> the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

18 U.S.C. § 3593(e). Defendant contends that this section eliminates a possibility that title 21's ADAA leaves intact: that a jury, despite finding that aggravating factors outweigh mitigating ones, might choose not to impose the death penalty.

The language of the statute does not compel such a pro-government reading. It provides that the jury is to determine whether the aggravating factors it has found "sufficiently outweigh" the mitigating ones—or, in the absence of mitigating factors, whether the aggravating factors on their own are "sufficient"—to justify execution. A jury that believed that, notwithstanding the

14

aggravating factors, a defendant should be permitted to live, would be on fair notice of its right to impose a lesser sentence after having had the statute read and explained. To make clear this jury discretion, the charge will instruct that the jury is never required to impose the death penalty.

### E. Ruling on Re-indictment

Viewed in toto and as applied, the current title 18 FDPA procedures are not "more onerous" than the former title 21 ADAA procedures. Rather, they are "ameliorative." *Dobbert*, 432 U.S. at 294. They may be applied in this prosecution after re-indictment predicated upon title 18's FDPA.

### III. Proposed Amendment of Death Notice to Allege Child Endangerment

The government moves to amend its notice of intent to seek the death penalty ("death notice") to add a non-statutory aggravating circumstance entitled "Child Endangerment Conviction." Repeated in substantial detail are the allegations it previously sought to introduce as evidence of a continuing pattern of violence demonstrating defendant's future dangerousness, also a non-statutory aggravating circumstance. *See United States v. Taveras*, 424 F. Supp. 2d 446, 463-464 (E.D.N.Y. 2006) (excluding from the penalty phase evidence of physical and sexual abuse of defendant's minor stepdaughter). Defendant opposes on procedural and substantive grounds.

Procedurally, the motion to amend is unobjectionable. Both FDPA and the former ADAA permit amendment upon a showing of good cause. *See* 18 U.S.C. § 3593(a) ("The court may permit the attorney for the government to amend the notice [of intent to seek the death

15

penalty] upon a showing of good cause."); 21 U.S.C. § 848(h)(2) (repealed) ("The court may permit the attorney for the Government to amend this notice for good cause shown."). Good cause is demonstrated where "the government's application was made in good faith and the defendant was not prejudiced." *United States v. Pitera*, 795 F. Supp. 571, 573 (E.D.N.Y. 1992).

No prejudice—in a technical procedural sense—would inure to defendant in this instance, since he has had notice of the government's intent to introduce the evidence of child abuse since at least April 2005, when it detailed its allegations in a letter opposing defendant's motion to strike the government's initial death notice. *See* Gov't Letter of April 5, 2005. The new proposed notice would not add new allegations, but merely reorganize them in response to this court's ruling. *See Pitera*, 795 F. Supp. at 573 (finding no prejudice to defendant where he had long "been on notice of the government's intent to rely on the seven additional homicides in seeking the death penalty. The amendment seeks only to recategorize that conduct within the capital statutory scheme."). There is no indication that the government has acted in bad faith.

Substantively, the amendment cannot stand. Nothing in the government's motion justifies departure from the court's previous ruling excluding this same evidence. *See United States v. Taveras*, 424 F. Supp. 2d at 463-464. The more stringent standard of admissibility provided for by title 18's FDPA strengthens the basis for the ruling that this evidence is inadmissible.

## IV.    Reciprocal Discovery and Notice of Mitigating Factors

To permit full access of each side to prospective theories and evidence of the other, and to allow a more expeditious trial, the government's motion for reciprocal discovery is granted.

After the government has supplied its list, defendant's witness list for the guilt and penalty phases shall be provided to the government the day that voir dire begins. Exchange of this information may not only speed the trial but also may make the voir dire more informed, and therefore more fair.

Pursuant to the court's earlier order, defendant has stated the mitigating factors he plans to allege. *See* Def't Letter of June 5, 2006. It includes 109 mitigating circumstances—far too detailed a list to submit to the jury to assist in its deliberations. Defendant is directed to redraft his list of proposed mitigating circumstances. Should he be unable to do so, the following list will be used:

1. As a child, defendant was a victim of physical, sexual, and emotional abuse; suffered extreme poverty and deprivation; and was affected by his father's mental illness.

2. Defendant suffered a severe beating in the Bronx in 1989 that made him prone to react strongly to threats to his safety.

3. Defendant has cognitive limitations and learning disabilities that have never been treated and that significantly diminished his capacity to appreciate the wrongfulness of his actions at the time of the crime.

4. Defendant does not pose a significant threat to the safety of other inmates or correctional officers while incarcerated.

5. Defendant has demonstrated the potential for rehabilitation within prison.

6. Execution of defendant will negatively affect his family and friends.

7. Other factors regarding defendant's background or the circumstances of the

offense justify imposition of a sentence other than death.

These factors, while still somewhat specific, better reflect practice in this circuit. *See* penalty phase jury charges in *United States v. Quinones*, 00-CR-761 (S.D.N.Y. 2004); *United States v. Al-'Owhali*, 98-CR-1023 (S.D.N.Y. 2001); *United States v. Dhinsa*, 97-CR-672 (E.D.N.Y. 1999); and *United States v. Pitera*, 90-CR-424 (E.D.N.Y. 1992) (all on file with the court). They will adequately frame and control jury deliberations. Defendant is free to prove any fact and make any argument he believes to be mitigating within the general parameters of his list. *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954 (1978).

Upon disclosure by the government to defendant of a brief summary of the evidence it plans to use to support each of its aggravating factors, defendant shall within three days respond in kind.

## V.     Attorney-Conducted Voir Dire

Defendant seeks the opportunity to conduct voir dire through his counsel. Control of voir dire is entrusted to the court if it wishes to exercise that power. *See* Fed. R. Crim. P. 24(a)(1) ("The court may examine prospective jurors or may permit the attorneys for the parties to do so."); *Rosales-Lopez v. United States*, 451 U.S. 182, 189, 101 S. Ct. 1629 (1981) ("[F]ederal judges have been accorded ample discretion in determining how best to conduct the voir dire."). Attorney-driven voir dire is disfavored, since the opportunity is often abused to delay and to prejudice the jury. *See, e.g., United States v. Barnes*, 604 F.2d 121, 142 n. 10 (2d Cir. 1979) (noting the tension between "the goal of promoting efficiency in the conduct of criminal trials without doing damage to the right of a criminal defendant to an unbiased and impartial jury, and

18

the desire of the defendant [and prosecution] to know as much as possible about those who sit in judgment . . ."). The general practice in this district is for the judge to ask all the questions or to supplement those posed in a written questionnaire. In a capital case it is particularly desirable to ensure that counsel for both parties have the opportunity to plumb the venirepersons' views on capital punishment, their understanding of mitigating and aggravating factors, and other issues.

Individual voir dire will be conducted in the jury room, with defendant present. Each side will be permitted 30 minutes to question each prospective juror. Defendant will begin with each juror, and will have the right to reserve five minutes of his time to follow the government's questioning. Additional time will be granted when the court deems it necessary.

## VI.    Limiting Press Access to Voir Dire

In recognition of the important constitutional role the media play in monitoring the judicial function, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575-76, 100 S.Ct. 2814 (1980), the court's normal practice is to permit the jury to attend general and individual voir dire and to provide copies of the blank jury questionnaire to members of the press as they are handed out to the prospective jury panel. *See Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 504-10, 104 S. Ct. 819 (1984) (First Amendment right of access extends to jury selection).

Defendant objects to this practice and requests that the press be excluded from voir dire and that the questionnaire be sealed until the close of the trial. Though the government takes no position on the propriety of excluding the press from voir dire, the court has an independent duty to ensure that the public, through the press, has adequate access to the processes of government.

## A. Distribution of Blank Jury Questionnaires

Defendant requests that the blank questionnaire not be made available to the prospective jurors until they are called for jury duty, and that the questionnaire be sealed until the end of trial. Citing an article published about an earlier motion in this case, he claims that "media speculation as to the meaning and purpose of specific questions [would] taint the pool of prospective jurors[] . . . ." Def. Br. 11. *See* John Marzulli, "Butchered drug rival?", N.Y. Daily News, February 6, 2006, at 34 (referring to lurid details of the instant case).

In cooperation with the parties, the court has developed the jury questionnaire with an eye to possible prejudice. Nothing in it will taint the jury pool.

Neither the venire nor the press will receive the questionnaire before the first day of jury selection. In some respects the questionnaire is like a Rorschach test; the answers tend to reflect real, rather than feigned, opinions only when immediate and unrehearsed.

Prospective jurors will be instructed at the beginning of voir dire that they are to ignore any media coverage of the case during the course of their service. This prosecution is not likely to attract widespread attention. The jury questionnaire itself is not likely to be a subject of intense interest, and does not lend itself to wide dissemination, repetition, or sensationalization. *Cf. In re NBC Universal, Inc.*, 426 F. Supp. 2d 49, 58 (E.D.N.Y. 2006) (prohibiting duplication until close of trial of audio-video recordings showing defense counsel consulting with John Gotti, Sr.; "instant recognizability" of Gotti name and media infatuation with it was highly prejudicial). The jury will necessarily see the jury questionnaire, as well as the evidence itself. *See id.* at 56 (prejudicial audio-video recordings were irrelevant to defendant's guilt and would not be shown to jury); *see also In re Application of Nat'l Broad. Co.*, 635 F.2d 945 (2d Cir. 1980) (affirming

20

district court decision to permit rebroadcast of portions of videotapes of public official defendants accepting bribes where videotapes had been admitted as evidence at trial).

Once the questionnaires have been filled out, blank forms will be distributed to the press. The completed forms will not be available since, conceivably, they could be traced to individual jurors who have revealed highly personal information on the promise of confidentiality.

### B.     Presence During Voir Dire

There is no reason to exercise prior restraint by excluding the media from voir dire. The press corps in this district is highly responsible. It is unlikely to reveal minor personal data revealed orally to supplement the much more searching written questions. In cases attracting far more attention than this one, it has behaved responsibly. Defendant's concern that the press will somehow interfere with the prospective jurors while they fill out the jury questionnaire is unfounded. In the highly unlikely circumstance that some member of the press or public should act inappropriately during the voir dire, the court will address the matter.

The press will also be permitted to observe the voir dire of the individual venirepersons.

### C.     Presence During Hardship Applications

Because of the private nature of applications for excuse from jury duty on the basis of hardship, the regular practice in this court is to limit presence when the application is being made to the court, counsel, and defendants. There is no reason to deviate from that practice in this prosecution. Hardship applications will be heard in private in the jury room, with only the court, counsel, defendant, United States Marshals, and the court reporter present.

21

## VII. Prospective Jurors' and Witnesses' Addresses

Section 3432 of title 18, United States Code, states that a defendant in a capital case "shall at least three entire days before commencement of trial be furnished with . . . a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness." Defendant maintains that "place of abode" refers to the venirepersons' and witnesses' street addresses, while the government contends that it refers only to townships of residence. In light of the different purposes to be served by provision of witness and juror identities, different treatment is appropriate.

Enacted in present form in 1948, section 3432 traces back to the first Congress. Though the phrasing has been modernized and the original statute provided only two days' notice of witnesses and jurors in non-treason capital cases, the key language at issue here—"place of abode"—has always been present. *Compare* 1 Stat. 118 § 29 (1790) *with* 62 Stat. 831 § 645 (1948).

The 1790s Whiskey Rebellion, a response to a new excise on distilled spirits intended to help the nascent federal government repay its Revolutionary War debts, gave the Supreme Court its first and only occasion to rule on the issue of what "place of abode" meant for present purposes. The Court ruled:

> The objection, that the place of abode of the jurors and witnesses, has not been sufficiently designated, in the lists furnished to the prisoners, is, likewise, in our opinion, a valid one. The object of the law was to enable the party accused to prepare for his defence, and to identify the jurors who were to try, and the witnesses who were to prove, the indictment against him. *It is contrary to the spirit and intent of such a provision, that the whole range of the State, or of a County, should be allowed, as descriptive of a place of abode;* and it is the duty of the Judges so to mould the practice and construction of statutes, as to render them reasonable and just. With regard to the place, therefore, we think *the townships in*

> which the jurors and witnesses respectively reside, should be specified; but the act
> of Congress does not require a specification of their occupations, and the niceties
> of the State act, are not, in that respect, incorporated into the Federal system.

*United States v. Insurgents of Pennsylvania*, 2 U.S. 335, 335 (1795) (emphasis supplied). This

case is not decisive. Contrary to the government's contention, it does not stand for the

proposition that the defendant is entitled to only the witness' or juror's township; rather, it

indicates that "the whole range of the State, or of a County" is insufficiently detailed. Contrary

to the defendant's position, this case does not compel the conclusion that a contemporary

defendant must have the street addresses of every witness and venireperson in order to "prepare

for his defence."

Few reported cases consider this issue, perhaps because the prosecution and defense

usually reach agreement on the discovery of opposing witnesses without need for a court ruling.

The American Bar Association Standards for Criminal Justice recommend that:

> The prosecution should, within a specified and reasonable time prior to trial,
> disclose . . . [t]he names and *addresses* of all persons known to the prosecution to
> have information concerning the offense charged . . . . The prosecution should
> also identify the persons it intends to call as witnesses at trial.

ABA Standard 11-2.1(a)(ii) (3rd ed. 1996) (emphasis supplied). *See also id.* commentary

(current edition is broader than previous Standards, which required only "the 'names and

addresses of witnesses'"). Many states require disclosure of addresses in all cases. *See, e.g.,* Cal.

Penal Code § 1054.1(a) (requiring prosecutor to disclose to defendant "[t]he names and addresses

of persons the prosecutor intends to call as witnesses at trial."); N.J. Crim. R. 3:13-3(c)(6)

(requiring prosecutor to grant defendant access to "names and addresses of any persons whom

the prosecutor knows to have relevant evidence or information including a designation by the

23

prosecutor as to which of those persons may be called as witnesses"); Conn. R. Sup. Ct. Cr. § 40-13(a) (defendant is entitled to "the names and, subject to [provisions providing for protection of the home addresses of law enforcement officials or others on good cause shown], the addresses of all witnesses that the prosecuting authority intends to call in his or her case in chief").

As to members of the venire, the ABA Standards recommend that jury questionnaires:

should include information about the juror's name, sex, age, *residence*, marital status, education level, occupational industry, employment address, previous service as a juror, and present or past involvement as a party to civil or criminal litigation.

ABA Standard 15-2.2(a)(1) (emphasis supplied). *See also United States v. Barnes*, 604 F.2d 121, 172 (2d Cir. 1979) (Meskill, J., dissenting) ("The case before us now is not a capital case but, nevertheless, it is the normal and better practice to provide to the government and the accused a list of prospective jurors and their addresses."); Federal Judicial Center, Benchbook for U.S. District Court Judges § 2.06 (March 2000 revision) (outline for voir dire assumes that "the court and counsel have been furnished with the name, address, age, and occupation of each prospective juror").

In either context, the aim of disclosure is to enable the defendant to prepare his defense—by investigating jurors for potential grounds for exclusion and witnesses for effective cross-examination.

The strong trend in criminal prosecutions is towards greater discovery. *Compare* Fed. R. Crim. P. 16 advisory committee notes (1944) ("Whether under existing law discovery may be permitted in criminal cases is doubtful." (citation omitted)) *with id.* (1966) ("The extent to which pretrial discovery should be permitted in criminal cases is a complex and controversial issue.");

24

*id.* (1974) ("Rule 16 is revised to give greater discovery to both the prosecution and the defense."); *id.* (1975) ("The proposed rule enlarges the scope of the defendant's discovery . . . ."); *id.* (1991) ("The amendment . . . expands slightly government disclosure to the defense . . . ."); *id.* (1993) (new provisions "expand federal criminal discovery"); and *id.* (1994) (clarifying that organizational defendants are entitled to same discovery as individuals). Yet the trial court retains discretion to regulate discovery in the interests of justice, administrative efficiency, and the protection of the public. *See* Fed. R. Crim. P. 16(d)(1) ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."); Fed. R. Crim. P. 57(b) ("A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district.").

Balancing the need of the parties for detail and that of non-parties for privacy, neither the parties nor the Federal Bureau of Investigation shall receive the addresses of the prospective or actual jurors unless on specific application as to particular individuals. A lengthy jury questionnaire has been prepared that inquires into the venire's socioeconomic background, beliefs about capital punishment, attitudes towards minorities, experience with drug abuse and crime, television viewing habits, and sundry other possible sources of bias. Counsel has been granted the opportunity to conduct voir dire of each member of the venire. By the conclusion of voir dire, counsel will have sufficiently detailed knowledge of each prospective juror to make an informed and meaningful decision on challenges. Disclosure of residential address would add negligibly to this fund of information, while threatening unnecessarily the privacy of those who may serve on the jury. Present internet searching capacities make providing specific addresses of prospective jurors unnecessary for adequate investigation. Intrusions by investigators may well

raise concerns among concerned citizens about identity theft, civil rights violations, and improper limits on jury representation of some minority groups.

Defendant shall receive, ten days before trial, a list of the witnesses against him with their home addresses. In the case of law enforcement officials, office addresses may be substituted at the government's discretion. The need for detailed field investigation of witnesses is much greater than that for jurors; no analog to the juror questionnaire exists that would permit defendant to adequately conduct his investigation without this information. The day of trial, the government shall receive a like list of prospective defense witnesses.

## VIII. Presence at Sidebars

Defendant moves to be present at any sidebars that may occur during the course of the trial. There will be no sidebars. *See* Order of Feb. 22, 2006, at 1. All trial matters are to be briefed and argued at 9 a.m., before the jury is called for the day's proceedings.

## IX. Admission of Prior Testimony

The government seeks the admission of the prior testimony of Raymond DeJesus, a former narcotics trafficking associate of defendant, under Federal Rule of Evidence 804(b)(1).

As part of a plea agreement, DeJesus testified against defendant in a 1999 state narcotics prosecution. Defendant was convicted and sentenced to 151 months imprisonment. DeJesus remained under supervised release until 2000. Despite searching immigration, FBI, criminal, and motor vehicle records, the government has failed to locate DeJesus. *See* Gov't Pre-Trial Br. 3-4 (detailing efforts).

Rule 804 provides for the admission, where the declarant is unavailable as a witness, of:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Fed. R. Evid. 804(b)(1).

In criminal prosecutions, this rule requires balancing of the need of the government to produce reliable evidence that is not available through direct testimony against a defendant's Sixth Amendment right to confrontation. Unlike several other hearsay exceptions, it is not affected by the Supreme Court's recent renovation of that right. *Compare Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354 (2004) (absent "unavailability and a prior opportunity for cross-examination[,]" testimonial hearsay may not be admitted against a defendant without violating his Sixth Amendment right to confrontation) *with* Fed. R. Evid. 804(b)(1) (premising admissibility on witness unavailability and prior opportunity to cross examine).

### A.  Unavailability

A witness is unavailable if he "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." Fed. R. Evid. 804(a)(5). A witness is not "unavailable" for purposes of the Rule "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 725, 88 S. Ct. 1318 (1968) (Sixth Amendment violated by admission of prior testimony where state prosecutors made no effort to secure appearance of

witness in federal custody).

No precise formulation determines whether the proponent of testimony has made a good faith effort to procure the witness's live testimony. "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S. Ct. 2531 (1980), abrogated on other grounds by *Crawford, supra.*

The government's efforts in this instance compare favorably with those found sufficient in *Christie v. Hollins*, 409 F.3d 120, 125 (2d Cir. 2005) (defendant had made "good faith efforts" to secure witness by leaving messages at witness's home, contacting witness' mother and friend, and attempting to contact witness' agent) and *Ohio v. Roberts, supra* (prosecutor issued subpoena to witness at parents' home five times over a period of several months; parents did not know how to contact her). *See also United States v. Sindona*, 636 F.2d 792, 804 (2d Cir. 1980) (witnesses were "unavailable" within meaning of Rule 804 when their location in a foreign nation was known but consular employee indicated that the witnesses were unwilling to return to the United States).

Defendant faults the government for not attempting to locate DeJesus in the Dominican Republic. There is no record of DeJesus leaving the United States. If he had, he would be not be subject to service of process, since the federal district court's power of subpoena does not extend to non-citizens beyond the nation's borders. *See* Fed. R. Crim. P. 17(e)(2) (subpoena of witness in foreign nation governed by 28 U.S.C. § 1783); 28 U.S.C. § 1783(a) ("A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it, or before a person or body designated by it, of a *national or resident* of the United States who is in a foreign country" (emphasis supplied)); *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir.

1984) (foreign citizens not amenable to service of United States process absent treaty or statute so providing). DeJesus is not a national or resident of the United States.

Since he is neither a defendant nor a fugitive, DeJesus is also not subject to extradition—assuming he has escaped the dangers of the drug trade and is still alive. *Cf.* Convention between the United States and the Dominican Republic for the extradition of criminals, 36 Stat. 2468, Article I (1910) (providing for extradition of those "who may be charged with, or may have been convicted of" crimes). The United States and the Dominican Republic do not have a mutual judicial assistance treaty, such as exists between this nation and a number of other foreign states, that would enable the government to request assistance in locating DeJesus and producing him for deposition as a matter of right. *Cf., e.g.,* Treaty with Israel on Mutual Legal Assistance in Criminal Matters, S. Treaty Doc. No. 105-40 (1999) (providing in part that assistance provided by a requested state shall include "taking the testimony or statements of persons" and "locating or identifying persons"). The government could seek to compel DeJesus's presence at trial through letters rogatory sent to the Dominican Republic and accepted as a matter of comity. *See* 28 U.S.C. § 1781 (conferring authority on federal State Department to issue letters rogatory). Such efforts are not required in this instance to demonstrate unavailability. *Cf.* United States Department of State, "Obtaining Evidence Abroad" at I.1 (available at travel.state.gov/law/info/judicial/judicial_688.html) ("Letters rogatory are a cumbersome, time consuming mechanism which should not be used unless there is no other alternative.").

Because this is a capital case, defense counsel have been granted almost unlimited sums for investigators. *See* 21 U.S.C. § 848(q)(9) (providing for disbursement of funds to permit

capital defendant to obtain "investigative, expert, or other services"). Trips to the Dominican Republic have been authorized. Yet defendant's investigators have not found the missing witness.

DeJesus is unavailable.


## B.      Prior Cross-Examination

It is not enough for a defendant to merely have had the opportunity to cross-examine a witness in prior proceedings. He must also have had a "similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). For a similar motive to obtain, "the questioner must not only be on the same side of the same issue at both proceedings but must also have a substantially similar degree of interest in prevailing on that issue." *United States v. DiNapoli*, 8 F.3d 909, 912 (2d Cir. 1993).

When determining whether a party had a "substantially similar degree of interest" in the prior proceeding, both the nature of the two proceedings and the cross-examination are considered.

> The nature of the two proceedings—both what is at stake and the applicable burden of proof—and, to a lesser extent, the cross-examination at the prior proceeding—both what was undertaken and what was available but forgone—will be relevant though not conclusive on the ultimate issue of similarity of motive.

*DiNapoli*, 8 F.3d at 915.

"Where both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial." *Id.* at

912. That is the situation in the present case.

First, the "same matter" was disputed at both trials. *Id.* At defendant's previous narcotics trafficking trial, DeJesus testified for the government that he dealt drugs for both his brother and defendant. He described the operations of the business, including use of a leased apartment, amounts sold on a weekly basis, and details of particular deals involving defendant and Carlos Madrid (who would later become one of defendant's alleged victims).

In the present prosecution, the testimony would only be used to prove the existence of a drug conspiracy—the very same nucleus of fact for which it was used in the first trial. The criminal penalties faced in both cases are severe. Defendant's motive to cross-examine DeJesus in the first trial—to avoid conviction of a serious felony—is "substantially similar" to that in the present prosecution. *DiNapoli* at 915.

Defendant claims that, since he is now facing the death penalty, his motive for cross-examining DeJesus is much greater than it was in his previous prosecution. Doubtless, "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978 (1976). Yet DeJesus's testimony concerns only defendant's narcotics trafficking activities, not the murders with which he is charged. Defendant does not point to, and the court could not find, any reported case basing a decision to exclude prior testimony on the grounds that the penalty faced by the defendant was greater in the second proceeding than in the first. Where, as here, both cases involved serious felonies with substantial potential punishments, and the conduct to be proven by the prior testimony in the first trial is identical to that to be proven by the testimony in the second trial, a defendant's motive will have been sufficiently similar to justify admission.

31

Second, the issue was "seriously disputed." *DiNapoli* at 912. Defendant charges that the cross-examination by defendant's previous trial lawyer was neither detailed enough nor vigorous enough to justify its use in the present trial. The transcript of the prior proceedings reveals otherwise.

On cross-examination, defendant's trial attorney brought out most conceivable sources of impeachment: the lies initially told by DeJesus to DEA agents, 1999 Trial Transcript ("T.") 193:14-194:3; the light sentence he received as a result of his agreement to testify, T. 194:20-195:3; his illegal entry into the country, T. 195:4-195:6; his own drug dealing, T. 205:8-206:21; his continued violations of the law by working off the books, failing to pay taxes, and remaining in the country without permission, and the government's decision not to prosecute him or deport him for these crimes, T. 207:17-211:3; his failure to abide by the cooperation agreement by not informing DEA agents or prosecutors when he met with his brother, David DeJesus, an unindicted coconspirator, T. 212:2-214:11; the possibility that his memory of the events had been altered by government preparation, T. 216:9-217:15; and contradictions in his descriptions of events as recent as the morning of trial. T. 217:24-218:16.

Admission of hearsay against a criminal defendant is always a second-best solution, even when the defendant has fully cross-examined the witness previously. "[O]pportunity to observe demeanor is what in a large measure confers depth and meaning upon oath and cross-examination." Fed. R. Evid. 804(b)(1) advisory committee notes (1972). It is appropriate under the Federal Rules of Evidence in this case.

To minimize the prejudice to defendant, extrinsic evidence impeaching DeJesus's credibility will be freely received.

32

## X. Exclusion of Unduly Prejudicial Evidence at Penalty Phase

An order excluding from the penalty phase evidence of child abuse by defendant, but permitting evidence of his domestic abuse of two adult women, was earlier issued in this prosecution. *See United States v. Taveras*, 424 F. Supp. 2d 446 (E.D.N.Y. 2006). The child abuse evidence was excluded because, under section 848(j) of title 21 of the United States Code, "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See id.* at 463-464 (ruling that unfair prejudice and confusion substantially outweighed evidence's tendency to prove future dangerousness). Subsequently, the parties alerted the court to the March 9, 2006 repeal of section 848's procedural provisions. *See* Part II, *supra*.

Federal Rule of Evidence 403 permits exclusion of evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The exclusion clause in the ADAA echoed Rule 403, except that undue delay, waste of time, and cumulative evidence were not grounds for exclusion. *See* 21 U.S.C. § 848(j) (repealed).

Title 21's ADAA, like Rule 403, permits exclusion of evidence when its "probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury." 21 U.S.C. § 848(k) (emphasis supplied); Fed. R. Evid. 403. By contrast, FDPA permits exclusion of evidence when its "probative value is *outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury." 18 U.S.C. § 3593(c) (emphasis supplied). Title 18's FDPA thus raises the bar for admission of prejudicial evidence. *See* Part

II.D.2, *supra. See also United States v. Sampson*, 335 F. Supp. 2d 166, 177 (D. Mass. 2004) (noting that FDPA results in exclusion of more evidence than Rule 403).

Wide discretion is lodged in the district court to exclude evidence that is, on balance, unduly prejudicial. Out of respect for "trial court[ ] expertise," *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006), evidentiary rulings are reviewed solely for abuse of discretion. *Old Chief v. United States*, 519 U.S. 172, 174 n. 1, 117 S. Ct. 644 (1997). *See also United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) ("A district court is obviously in the best position to do the balancing mandated by Rule 403. We will second-guess a district court only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." (internal quotation marks and citations omitted)). "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d at 131 (affirming district court's exclusion of grand juror testimony in perjury trial). *See also Hester v. BIC Corp.*, 225 F.3d 178, 181 (2d Cir. 2000) ("A district court's evidentiary rulings will be disturbed only if they are manifestly erroneous." (internal quotation marks omitted)).

Because the government plans to re-indict under title 18's FDPA, which demands a broader exclusion of prejudicial information, additional evidentiary rulings are required.

The court set out in detail the constitutional background and statutory rationale for its decisions on exclusion of penalty phase evidence in its prior order on the topic. *See United States v. Taveras, supra.* It addressed the constitutional requirements at capital sentencing under the Supreme Court's Eighth Amendment jurisprudence, including the requirement of channeled jury discretion, *id.* at 449-450; the preferential treatment granted mitigating factors over

34

aggravating factors, *id.* at 450-451; and the "heightened standard of reliability" necessary at capital sentencing. *Id.* at 453 (quoting *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S. Ct. 2595 (1986)). The court found that, while receiving testimony that defendant had physically abused two adult women with whom he had previously been involved was appropriate, airing testimony of his sexual and physical abuse of his minor stepdaughter was substantially more prejudicial than it was probative of his future dangerousness and would be excluded. *See id.* at 463-464.

Central to this ruling was a question, often overlooked, that rises again now: Of what is evidence offered by the government at the penalty phase probative? In the prior order, as now, future dangerousness was at issue. The government alleged, in support of the death penalty, that defendant was "likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others . . . ." Notice of Intent to Seek the Death Penalty ("Death Notice") 4. In support of this factor it set out three categories of evidence: a continuing pattern of violence; institutional misconduct; and lack of remorse. Each of these was appropriate. Each could support the proposition that defendant needed to be completely and permanently incapacitated by execution, rather than partially and temporarily incapacitated by imprisonment, for the safety of the public. *See Taveras*, at 455-457 (explaining why incapacitation, and not the other three philosophical rationales for punishment—retribution, deterrence, and rehabilitation—underlies the future dangerousness aggravating factor).

Having identified the proposition to be proven, the court was then able to undertake the balancing required by section 848(j) by determining, first, how probative of future dangerousness the proffered evidence was, and, second, whether the danger of unfair prejudice, confusion of the issues, or misleading the jury substantially outweighed that probative force.

35

Similar analysis is in order here. At issue is evidence that defendant dismembered the victims' bodies after killing them. Evidence of this post-mortem dismemberment will not be received.

In support of its allegation of future dangerousness, the government cites defendant's lack of remorse, "as demonstrated by his statements during the course of and following the offenses, and his actions during the course of and following the offenses." Death Notice 5. As to the murder of Rosario, the government has alleged that, after defendant shot the victim:

> Loyola [a coconspirator in defendant's alleged drug enterprise] and Pepin then carried Rosario's body to the bathroom and placed it in the tub. After Loyola left the apartment, Pepin went home, where his then-girlfriend Julia Mendez was waiting. Pepin ate dinner, then brought Mendez to the apartment. At some point, Pepin's cousin, Apolinar Taveras, also known as "Apolino Talavero" and "Miguel Acosta," also entered the apartment. Using a relatively small knife, Pepin dismembered Rosario's body and placed it into garbage bags. Pepin and Loyola then drove to Yonkers where Pepin dumped the bags.

Gov't Letter of April 5, 2005, at 2. As to the murder of Madrid, the government has alleged that, after:

> hitting him in the back of the head with a blunt instrument and stabbing him in the chest[,] Pepin then dismembered Madrid's body using a knife. Afterward, he placed Madrid's body in garbage bags. Then Pepin, [sic] drove Madrid's car to Queens, where Pepin dumped the bags and set Madrid's car on fire.

*Id.* at 3.

The government would prove these allegations through the testimony of witnesses; photographs of the recovered remains; and defendant's statements to law enforcement personnel, nearly all of which have survived *Miranda* challenges. *See United States v. Taveras*, No. 04-CR-156 (JBW), 2006 WL 626248 (E.D.N.Y. Feb. 22, 2006). The government intends to offer the evidence of dismemberment at both phases of the trial.

36

## A.     Prejudice and Probative Value: Guilt Phase

At the guilt phase, Rule 403 would apply. Evidence of dismemberment would be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

The prejudice from the testimony about the manner in which defendant dismembered the bodies and pictures of the recovered body parts is evident. They are horrifying. Upon viewing them and hearing the testimony, a jury might convict the defendant without proper regard to his mental state at the time of the crime. Yet aspects of the photographs and testimony—particularly the precise manner in which the bodies were dismembered—are also highly probative of that mental state.

At the guilt phase, such evidence would be pertinent. To secure a conviction on the capital charges, the prosecution must convince the jury beyond a reasonable doubt that defendant "intentionally kill[ed] or counsel[led], command[ed], induce[d], procure[d], or cause[d] the intentional killing of an individual and such killing result[ed]." 21 U.S.C. § 848(e)(1)(A). Defendant has indicated that he does not intend to contest that he killed Madrid and Rosario, lessening the need for witness testimony on the fact of the killing. A stipulation to the victims' deaths at defendant's hands would thus be an alternative source of proof. *See Old Chief v. United States*, 519 U.S. at 184) ("[T]he Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives."). Yet the government must prove not merely the fact of the killing, but defendant's intent.

37

Evidence that defendant calmly dismembered the victims' bodies shortly after killing them would tend to show that the killings were not accidental—that is, that he was calm, collected, and rational shortly before the killings. The precise manner in which defendant disposed of the bodies—using a knife and drawing on his skill as a butcher to cut at the joints—suggests not a panicked reaction to accidental death but a considered effort to hide a criminal act. These details form part of the res gestae, the narrative that the government rightly seeks to tell at the guilt phase of a trial. *Old Chief v. United States*, 519 U.S. 172, 187, 117 S. Ct. 644 (1997). Their probative value would not be "substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403.

### B.      Prejudice and Probative Value: Penalty Phase

The penalty phase of a capital trial is unique in the criminal law. It calls upon jurors to decide, by reasoned moral consideration, whether a fellow human deserves to be executed for his or her crimes. As noted in the prior order excluding evidence, cognizance must be taken of the distinct roles served by the judge and jury under the capital sentencing procedures. "[O]ne of the most important functions any jury can perform" when "exercising its discretion" during capital sentencing is "to maintain a link between contemporary community values and the penal system." *Woodson*, 428 U.S. at 295 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519 n. 15, 88 S. Ct. 1770 (1968)). But jury discretion must be "suitably directed and limited." *Gregg*, 428 U.S. at 189. The jury need not receive complete information about all aspects of a defendant's crime. It is entitled to "adequate information," *id.* at 195, that does not "prejudice the defendant." *Id.* at 204.

Federal courts bear responsibility for ensuring that trials before them are conducted in conformity with statutory imperatives and the fairness required by the Constitution. Because of the heightened need for reliability in capital sentencing, *Ford v. Wainwright*, 477 U.S. at 411, the court should be exceptionally careful when considering whether to admit or exclude evidence under title 18's FDPA. Much Rule 403 precedent declining to exclude is not decisive: the criminal cases generally balance the probative value against unfair prejudice or confusion of the issues in the determination of guilt. *See, e.g., Awadallah*, 436 F.3d at 126; *Old Chief*, 519 U.S. at 175. As noted above, the title 18 FDPA admission standard is more stringent than that of Rule 403.

The decision whether to impose the sentence of death calls for a determination not only of whether defendant committed the acts of which he is accused with the necessary mens rea, but also whether several carefully defined circumstances have been fulfilled—and, if they have been fulfilled, whether they sufficiently outweigh any mitigating circumstances, more vaguely defined, to justify execution of the defendant. This judgment demands a careful balancing of aggravating and mitigating circumstances, not the choice of competing narratives. Accordingly, the government's right, at the guilt phase of a non-capital trial, to "tell[] a colorful story with descriptive richness," *Old Chief*, 519 U.S. at 187, and to make use of the persuasive power of a "train of events," *id.* at 189, is not necessarily applicable to the sentencing phase of a capital trial.

The evidence of post-mortem dismemberment is to be offered by the government during the possible penalty phase to prove defendant's lack of remorse. Though susceptible of multiple interpretations, post-mortem dismemberment provides some evidence that defendant was not remorseful at the time of the killings. The possible prejudice at this phase is that the jury may

react with disgust to defendant's past actions, rather than considering their pertinence to his future dangerousness.

It bears emphasis that the jury is not simply directed to determine whether this man should live or die. Constitutional jurisprudence and the federal capital statute require that jury deliberations be channeled into whether certain narrowly defined aggravating factors are met. If they are not, the jury cannot impose the death penalty, even if it is inclined to do so. *See* 18 U.S.C. § 3593(d) (if jury does not unanimously find that defendant acted with required mental state and that at least one aggravating factor is present, the court must impose a sentence other than death). Even if one or more aggravating factors are proved, the jury must weigh them against any mitigating factors and determine whether, on balance, death is warranted. 18 U.S.C. § 3593(e). If no mitigating factors have been found, the jury must still determine whether the aggravating factors, by themselves, are sufficient to warrant death. *Id.*

Pictures and statements such as those proposed to be proffered by the government to the jury in this instance short-circuit this carefully choreographed process by tending to rush the jury into an emotional conclusion. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358, 97 S. Ct. 1197 (1977). The court has a duty to minimize the "risk [of] a verdict impermissibly based on passion, not deliberation." *Payne v. Tennessee*, 501 U.S. 808, 836, 111 S. Ct. 2597 (1991) (Souter, J., concurring). *Cf. Kansas v. Marsh*, — S. Ct. —, No. 04-1170, 2006 WL 1725515 (June 26, 2006), at *25 (Souter, J., dissenting) (Eighth Amendment requires "a *reasoned* moral response" to the defendant's crime and character (emphasis supplied)).

## C.    Exclusion of Post-Mortem Evidence

Evidence of post-mortem dismemberment will not be received in the penalty phase. Since one jury will hear both the penalty and guilt phases, such evidence also will not be received at the guilt phase. Reference to it during voir dire is prohibited.

In order to ensure that the government is not unduly hampered in its efforts to carry its burden of proving that defendant acted with intent, the parties are expected to stipulate that:

- After killing Rosario, defendant returned home, ate dinner, and then returned to the apartment with Julia Mendez. Defendant wrapped the body, drove it to Yonkers with Loyola, and dumped it.

- After killing Madrid, defendant wrapped the body, placed it in Madrid's car, drove the car to Queens, and set it on fire.

The stipulations would permit a jury to find that defendant's actions were intentional rather than accidental, and suggest a lack of remorse. Should the parties fail to stipulate the Court will reconsider its ruling on this point.

This ruling sacrifices some of the probative force of the government's proposed evidence. Yet it is necessary to preserve defendant's right to capital proceedings that are properly channeled and focused on the issue for which the evidence is offered—i.e., future dangerousness.

## XI.    *Daubert* Hearing on Expert Evidence of Future Dangerousness

Defendant's motion for a *Daubert* hearing on the government's expert evidence of future dangerousness is granted. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786 (1993) ("[U]nder the [Federal] Rules [of Evidence] the trial judge must

ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

There are two aspects to the prediction of future dangerousness. The first is whether a reliable prediction is, in general, possible, given the state of knowledge in the field of behavioral studies. The second is whether a prediction in this case, based on examination of this defendant and review of the evidence surrounding these crimes, is founded on sufficient data and properly carried out. *See* Fed. R. Evid. 702 (expert testimony is inadmissible unless "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").

Because of the court's order delaying government examination of the defendant until after a guilty verdict on a capital charge, *see United States v. Taveras*, 233 F.R.D. 318 (E.D.N.Y. 2006), the second aspect of the *Daubert* inquiry will be deferred. The first can proceed now.

Defendant has produced an expert report by Mark Cunningham, Ph. D., purporting to demonstrate that predictions of future dangerousness in the federal prison system are unreliable. The government has indicated that, should Dr. Cunningham testify at the penalty phase in accordance with his report, it will seek to introduce expert testimony on the capability of the Bureau of Prisons to control and protect inmates and correctional staff. This rebuttal expert is subject to *Daubert* review, even if his or her expertise is not "scientific." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999). The government is directed to retain such an expert—if it continues to intend to use one—and provide a report within 30 days, so that an evidentiary hearing on the general matter of predictions of future dangerousness in the federal

42

prison system may be promptly held.

## XII.   Conclusion

This memorandum and order embodies the court's rulings on all outstanding motions. The parties are directed to proceed in accordance with its directives forthwith.

A further hearing will be scheduled shortly to decide in detail on the jury questionnaire, voir dire jury charge, preliminary trial jury charge, guilt phase jury charge, penalty phase jury charge, and verdict forms. Some preliminary advice by the court to the parties on these matters has already been given orally.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: June 29, 2006
      Brooklyn, New York