
FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 1 4 2008 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA,  )
                           )
                           )
            v.             )
                           )
HUMBERTO PEPIN TAVERAS,    )
also known as "Tony"       )
and "Luis Rosario"         )
                           )
            Defendant.     )
———————————————————————————)

04-CR-156 (JBW)

MEMORANDUM AND ORDER
SELF DEFENSE

**JACK B. WEINSTEIN, Senior United States District Judge:**

## I.    Introduction

Defendant Humberto Pepin Taveras plans to present a self defense claim in his forthcoming homicide trial. The government seeks a death sentence for defendant's killing of two of his associates during the course of disputes over the conduct of an illegal drug trafficking enterprise. Subject to reconsideration based on testimony elicited at trial, defendant may rely on self defense.

Were this a litigation where defendant's life was not at stake, the probable evidence of self defense might be deemed insufficient to warrant a jury charge on the subject, pretermitting the claim. One of the collateral aspects of capital punishment is, however, application of the rules of relevancy and other evidentiary principles to maximize protections—imperfect as they may be—against inappropriate executions by the state. Cf., e.g., Kennedy v. Louisiana, ___ U.S. ___, 2008 WL 2511282, 2008 U.S. LEXIS 5262 (June 25, 2008) (holding that the Constitution prohibits the death penalty for the rape of a child where the crime did not result, and was not intended to result, in death of the victim); Roper v. Simmons, 543 U.S. 551 (2005) (holding that the Constitution prohibits the death penalty for a person who committed crime as a juvenile);

1



Atkins v. Virginia, 536 U.S. 304 (2002) (holding that the Constitution prohibits the death penalty for mentally retarded persons); New York v. LaValle, 3 N.Y. 3d 88, 102 (2004) ("death is different and . . . [N.Y.]CPL 470.30 confers upon this Court unique powers of review"); Shepard v. United States, 290 U.S. 96, 100 (1933) (Cardozo, J.) (limiting admissibility of dying declarations in capital cases: "There must be 'a settled hopeless expectation' that death is near at hand, and what is said must have been spoken in the hush of its impending presence. . . . The [victim] must have spoken with the consciousness of a sure and certain doom.") (citations omitted); Jeffrey Abramson, Death-is-Different Jurisprudence and the Role of the Capital Jury, 2 Ohio St. J. Crim. L. 117 (2004).

> As the majority recognized in Kennedy:
>
> It is an established principle that decency, in its essence, presumes respect for the individual and thus moderation or restraint in the application of capital punishment.
>
> . . . [T]he Court has insisted, to ensure restraint and moderation in use of capital punishment, on judging the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

Kennedy, 2008 WL 2511282, at *11, 2008 U.S. LEXIS 5262, at *49-*50 (citations omitted and quotation marks omitted). The Court went on to illustrate why the special problem of proof in all capital cases is enhanced in child rape, the example it was dealing with:

> There are, moreover, serious systemic concerns in prosecuting the crime of child rape that are relevant to the constitutionality of making it a capital offense. The problem of unreliable, induced, and even imagined child testimony means there is a "special risk of wrongful execution" in some child rape cases.

Id., 2008 WL 2511282, at *24, 2008 U.S. LEXIS 5262, at *62 (quoting Atkins, 536 U.S. at 321).

See also, e.g., United States v. Taveras, 436 F. Supp. 2d 493, 514 (E.D.N.Y. 2006) ("Because of the heightened need for reliability in capital sentencing, the court should be exceptionally careful

when considering whether to admit or exclude evidence . . .") (citing <u>Ford v. Wainwright</u>, 477 U.S. 399, 411 (1986), <u>rev'd on other grounds sub nom.</u> <u>United States v. Pepin</u>, 514 F.3d 193 (2d Cir. 2008).

Cardozo in his classic <u>New York v. Zackowitz</u> opinion warned of the dangers in trying capital-homicide-self-defense cases:

> With only the rough and ready tests supplied by their experience of life, the jurors were to look into the workings of another's mind, and discover its capacities and disabilities, its urges and inhibitions, in moments of intense excitement. Delicate enough and subtle is the inquiry, even in the most favorable conditions, with every warping influence excluded.

254 N.Y. 192, 195 (1930).

> The killer admits the killing, but urges self-defense and sudden impulse. Inflexibly the law has set its face against the endeavor to fasten guilt upon him by proof of character or experience predisposing to an act of crime. The endeavor has been often made, but always it has failed. At times, when the issue has been self-defense, testimony has been admitted as to the murderous propensity of the deceased, the victim of the homicide, but never of such a propensity on the part of the killer. The principle back of the exclusion is one, not of logic, but of policy. There may be cogency in the argument that a quarrelsome defendant is more likely to start a quarrel than one of milder type, a man of dangerous mode of life more likely than a shy recluse. The law is not blind to this, but equally it is not blind to the peril to the innocent if character is accepted as probative of crime. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.

<u>Id.</u> at 197-198 (citations and quotation marks omitted).

Rules of evidence are generally applied to favor defendants in capital cases. The judge may exclude evidence that otherwise would be admissible or permit evidence that otherwise would be inadmissible. The court must have in mind the possibility of a miscarriage of justice. Once the sentence is carried out, it is not reversible. When the New York Court of Appeals was reviewing capital cases, it was the practice of each judge to comb the record for any possible

basis for reversal not raised by the parties. See, e.g., New York v. Wood, 12 N.Y.2d 69, 78 (1962) (Fuld, J., dissenting) (in capital case, objection need not be raised to preserve for review on appeal); New York v. Miller, 6 N.Y.2d 152, 154 (1959) (in capital case, court can review issues concerning sufficiency and weight of evidence to support conviction even if not properly raised); New York v. Hetenyi, 304 N.Y. 80, 94 (1952) (procedure for review of capital cases not dependent on noted exceptions and objections); New York v. Crum, 272 N.Y. 348, 350 (1936) (in capital cases only, Court of Appeals is empowered to review both questions of fact and law).

The federal death sentence statute embodies the wisdom of the judges. In the penalty phase of a capital case the rules of evidence must be moderated in a way that tends to favor the defendant. It reads:

> Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C. § 3593(c) (emphasis added). In theory, loosening of punishment phase rules tending to favor the defendant would not affect administration of the guilt phase of the case. Id. See Taveras, 436 F. Supp. 2d at 515-16 ("Evidence of post-mortem dismemberment will not be received in the penalty phase. Since one jury will hear both the penalty and guilt phases, such evidence also will not be received at the guilt phase."), rev'd sub nom. Pepin, 514 F.3d at 207 ("Although acknowledging once again the degree of deference we pay to a district court's ruling on the admissibility of evidence, we also conclude that the order excluding all evidence as to post-mortem dismemberment, to the extent that it relies on Rule 403, was an abuse of discretion."); United States v. Fell, __ F.3d ___, 2008 WL 2552863, at *12 & *13 n.12, 2008 U.S. App. LEXIS 13831, at *44-*45 & *46-*47 n.12 (2d Cir. June 27, 2008) ("[T]o achieve such

heightened reliability as required in considering a sentence of death, more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors.") (internal quotation marks and citations omitted). Yet, since the same jury is deciding both guilt and punishment, it is awkward to allow exculpatory evidence in only on the penalty issue when a juror might think, "why were we not told about this before since it might have pushed us off the knife edge of reasonable doubt to a finding of innocence or even to a hung jury?"

The defendant here seeks the protection of the rule of self defense. Confrontation rights and hearsay exclusions in practice are designed to protect defendants against inculpation, not to limit their use for exculpation. See, e.g., Giles v. California, __ Sup. Ct. ___, 2008 WL 2511298, 2008 U.S. LEXIS 5264 (June 25, 2008). See also id., 2008 WL 2511298, at *26, 2008 U.S. LEXIS 5264, at *47 (Breyer, J. dissenting) ("In Crawford v. Washington, 541 U.S. 36 (2004), we held that the Sixth Amendment's Confrontation Clause bars admission against a criminal defendant of an un-cross-examined "testimonial" statement that an unavailable witness previously made out of court.") (emphasis added); Lilly v. Virginia, 527 U.S. 116, 130 (1999) ("But because hearsay statements of this sort are, by definition, offered by the accused, the admission of such statements does not implicate Confrontation Clause concerns."); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); United States v. Flores, 985 F.2d 770, 781 (5th Cir. 1993) ("The hearsay rules operate in civil as well as criminal proceedings, and may be invoked by the government as well as by the citizen. But the Confrontation Clause applies only in criminal prosecutions and protects only the accused.").

An informal poll of a number of federal judges experienced in the trial of capital cases agree on this point: in instances of doubt on admissibility of evidence favoring a capital

defendant or excluding disfavoring evidence, the court is more likely to rule in favor of the defendant. This is not surprising since a dark cloud hanging over the American legal system is the risk of executing an innocent person—an irreversible stain on justice. See, e.g., Felix Frankfurter, The Case of Sacco and Vanzetti: A Critical Analysis for Lawyers and Laymen 108 (Universal Lib. ed., Little, Brown & Co. 1962) ("All systems of law, however wise, are administered through men, and therefore may occasionally disclose the frailties of men. Perfection may not be demanded of law, but the capacity to correct errors of inevitable frailty is the mark of a civilized legal mechanism.").

## II.    Evidence

On February 20, 2004, defendant Humberto Pepin Taveras was indicted for two counts of murder pursuant to 21 U.S.C. § 848(e)(1)(A), enacted as part of the Anti-Drug Abuse Act of 1988. The grand jury issued a superceding indictment on June 18, 2004, adding a charge of obstruction of justice. On January 14, 2005, the grand jury returned a second superceding indictment which included special findings necessary for the government to seek the death penalty. The government is seeking the death penalty, having rejected defendant's proposal to plead guilty with a fifty year term of imprisonment. See United States v. Pepin, 367 F. Supp. 2d 315, 316 (E.D.N.Y. 2005).

A former drug dealer, Pepin is accused of having murdered two drug dealers, one in 1992 and the other in 1995. José Rosario was killed in 1992. Carlos Madrid was killed in 1995.

Neither murder allegedly committed by Pepin would have been solved had he not, while serving a 151-month sentence in federal prison for drug distribution, contacted the authorities on his own initiative, insisted upon an investigation, and confessed multiple times to both murders. Beginning in March 2002,

6

He sent officers unsolicited confession letters and voluntarily called the police to confess ever more details of his crimes. He also insisted on meeting with the police in person repeatedly. So desperate was he to become a friend of the police that he sought to cooperate with various independent state authorities in New York and New Jersey. Nothing short of a piece of duct tape across his lips could have kept defendant from confessing over and over again.

United States v. Taveras, No. 04-CR-156, 2006 WL 626248, at *7, 2006 U.S. Dist. LEXIS 10128, at *19-*20 (E.D.N.Y. Feb.22, 2006). Pepin appears to have believed that revealing information he had about the killings would reduce his drug distribution sentence. See id., 2006 WL 626248, at *1, 2006 U.S. Dist. LEXIS 10128, at *2.

## A.    *Defense*

Pepin in open court acknowledged that he understands that a claim of self defense requires, in effect, an admission of the killings by him. Transcript of July 9, 2008 Hearing ("Tr. Hr.") at 3. He does not currently expect to testify at trial. See id. at 3-6.

The defense expects to establish a claim of self defense on cross-examination of three witnesses that it anticipates the government will call: (1) Julia Mendez, Pepin's common-law wife when the killings of José Rosario and Carlos Madrid occurred; (2) George Loyola, Mendez's brother, who sold drugs for Pepin; (3) and Julissa Pantajos, Mendez's daughter. Each has been interviewed by investigators employed by the defense. Each has made statements that might permit, Pepin argues, a rational jury to reasonably conclude that he was acting in self defense when he killed Rosario and Madrid. The statements that Loyola, Mendez, and Pantajos have allegedly given to defense investigators are generally consistent with statements that they provided to law enforcement agents, except for certain exculpatory matters.

The defense notes that Pepin has, in both formal and informal statements to law enforcement agents and third parties, including letters and telephone calls, provided information

7

that explains or clarifies the circumstances in which Rosario and Madrid were killed. Pepin's statements to law enforcement agents are consistent in the main with what Loyola and Mendez have told law enforcement agents and defense investigators. This consistency possibly may be interpreted as an indication of Pepin's reliability as a narrator of critical events.

*1.     José Rosario*

Based upon statements that Loyola made to defense investigators and statements that law enforcement agents obtained from Loyola, the defense expects that, if called as a witness, Loyola will confirm that just before Rosario was killed, a third party by the name of either Nelo, or Mello, (hereinafter "Nelo") informed Pepin that Rosario had directed Nelo to kill Pepin, Mendez and their children and to seize Pepin's drugs. Loyola was present when Nelo told Pepin that Rosario had directed Nelo:

> just to rip you off and just kill you and to kill your wife, to kill your brother-in-law, to kill your niece and to—and to take your drugs and go. And Tony [Pepin] said, "yeah he said that?"

Loyola gave law enforcement agents a detailed account of how Nelo revealed to Pepin that Rosario had sent Nelo to kill:

> Barragita [Rosario] also hung out with a male by the name of Nelo. Nelo was Dominican and he was shorter than me and skinny. One day in the summer of 1992, 1 (sic) was in the apartment on Sherman Ave. with Tony [Pepin], my sister Julia and Julia's daughter. I heard a knock on the apartment door and when I answered the door I saw it was Nelo. Nelo came into the apartment and he then bought a ½ gram of coke. . . the next day some time in the afternoon while I was in the apartment with Tony, Nelo came by the apartment. Nelo told Tony that he had to speak to him. Nelo then went on to tell Tony that Barragita sent him over here yesterday to kill him, me and my sister. Nelo told Tony that he saw his wife and kid and he could not do it. Nelo said that Barragita told him to kill him and to take his money and his drugs.

8

According to Loyola's March 5, 2003 statement to law enforcement agents, Pepin did not believe that Rosario really wanted him killed. Pepin told Loyola that he wanted to speak to Rosario to ascertain if Nelo's accusations were true.

The day after it is claimed that Nelo told Pepin that Rosario wanted him killed, Rosario showed up at the Pepin's Sherman Avenue apartment, uninvited:

> Barragita [Rosario] came by the apartment. I did not let him in because I thought he was going to kill me. Barragita told me that he wanted to speak to Tony [Pepin]. I told him that Tony was not here. I told Barragita to wait downstairs and I would beep Tony. I then got dressed and I went downstairs to the store to beep Tony. Barragita was waiting in front of the building. When Tony called me back he told me to tell Barragita to wait because he was coming by and he had some drugs for Barragita to sell.

Loyola is expected to testify that he was present when Pepin confronted Rosario with Nelo's assertion that Rosario had directed Nelo to forcibly take Pepin's drugs and to kill him, Mendez, and their children. Loyola told defense investigators:

> I'm over here, standing, nervous because I want to get the heck out of [UI] I want to fly out, but I was like stiff, I couldn't move [UI] and he comes out and says, "I want you to tell me the truth. You sent your - your - your - your buddy here the other day to - to rip me off and to take" his drugs. He goes, the guy goes like this, "no, no, no, what are you talking about, no, no, what one you about, like I say he couldn't get up." But because it was kind of slow on him. And he says, "stay right there. That you sent him the day before yesterday right here." When, uh, my sister was here that day [UI] my niece [UI] ah, they was just relaxing and he had came in with his friend and told Tony everything that he, he had sent him to rip him off and then to kill him and my sister.

According to Loyola, when Pepin demanded that Rosario confirm or deny that he had directed Nelo to kill him and his family, Rosario stood up as if he was advancing towards Pepin. At that point, Pepin fired his gun several times. One of the bullets his Rosario in the face, just under his eye:

> Did you see [sic] this guy, Nelo, to him we off and then to kill my wife, my niece, and, my brother-in-law and what did Pepin say, "tell me, tell me, come here, I'll shoot you right here," and he tried to get up and he just went "Bah! Bah! Bah!

Bah! Bah! Bah! Bah! Bah!" And I'm standing right here and he puts the gun right there and I'm looking at the guy, but I don't see no blood in here, he say [UI] the hole I don't know if it was a six shooter and same shooter. But it was plenty. So I'm looking at the guy and I don't see no blood the I see something go makes noise. The blood's spreading and he's going like make noise and I'm going like, "oh my God" I couldn't move, I couldn't move. So he put more bullets with the gun, "George, help me pick him up." What the? "What are you talking about pick him up?" I said. [UI]. "George pick him up" and I just couldn't move [UI] and he goes, picks up the gun, and goes, "George!" and I say, "what!" and he says, "Come on," and I say, "I'm not going to touch that man, no way." So he points the gun at me and says, "Do it!" I had to think of something because I had never seen nothing like this in my life.

In an interview conducted by defense investigators, both Mendez and her daughter Julissa Pantojas echoed Loyola's assertion that Pepin knew that Rosario had assigned someone to kill him and his family. According to Pantojas, it was general knowledge and a topic of discussion among the family that Pepin knew that Rosario had hired someone to kill him.

According to the defense, Mendez was not present when Nelo told her brother Loyola and others that Rosario had directed him to kill Pepin. Mendez, however, told defense investigators that Rosario regularly demanded money from Pepin. On one occasion, Mendez heard Rosario tell Pepin that Pepin would "pay" for refusing Rosario's demands for money. On another occasion, Mendez overheard a telephone conversation in which Rosario threatened to kill Pepin if he continued to refuse Rosario's demand for money. On the day that Pepin told her that he had killed Rosario, he showed Mendez a gun and said it was the gun that Rosario had given someone else to use to kill Pepin and that Pepin had instead used the gun to kill Rosario.

Mendez's statement to defense investigators regarding Rosario appears to be consistent with what she told law enforcement:

I know Barragita [Rosario] was a heavy set guy who would rob drug dealers and then he would give the drugs to Tony [Pepin] to sell. I also know that Barragita owed Tony some money and that Tony did not trust Barragita. Tony was also upset because Barragita stole some drugs and he Barragita did not give the drugs to Tony and Tony was upset about that.

10

Tony told me that Barragita sent a friend of his to kill Tony with a gun. Tony told me that this guy was also a friend of his and this guy told Tony what Barragita wanted him to do.

2.    *Carlos Madrid*

During an interview with defense investigators, Loyola stated that his sister, Julia

Mendez, had given him the following account of how Carlos Madrid, "the Colombian" died:

> The guy went into the kitchen, the Colombian [Madrid] went into the kitchen and start to [sic]. That's what my sista was telling me. Telling me that, and, and he wants his money. "If I don't get my money, I'm gonna kill your wife and your daughter, right now, or I take 'em with me 'cause he, he goes, "yeah, that's [UI] and he went to the kitchen, and then he gotta hit you with a hammer, turned around and hit the guy on the head, cracked his head up [UI]. And he just stands around. [UI] 'Cause I heard that, that, that when they took the body, they drive it somewhere, I think it was, I think it was the cops stopped 'em or something?

> DB [David Barrett]:    Mm-hmm.

> GL [George Loyola]: I don't know.

> DB:                But the other guy was threatening Tony, also?

> GL:                The Colombian guy?

> DB:                Yeah.

> GL:                That's what I heard.

Defendant expects that, if called as a witness, Mendez would confirm that Madrid had

been demanding money from Pepin and threatening to kill or kidnap her and their daughter if

Pepin failed to pay him.

According to Mendez, Madrid was being pressured by third parties to compensate them

for kilos of cocaine that had been stolen. To avoid being killed by the owners of the missing

cocaine, Madrid was trying to raise money; he convinced Pepin to give him Pepin's Porsche

automobile to be used as a payment to the owners of the missing cocaine.

Apparently, the Porsche was not enough. Madrid began pressuring Pepin to give him a BMW automobile. Pepin refused. Consequently, Madrid called and threatened to kidnap Pepin's daughter:

> JM [Julie Mendez]:   So then, um, he wanted him to give him the BMW too. So I remember one day that Carlos called and started arguing with Tony and then he started telling Tony, "Help me, help me, or or I'm gonna grab your daughter."
>
> IM [Indhira Molina]:   Carlos told this to Humberto?
>
> JM:   Yeah. He said he was going to do something to his daughter and that was it [UI]

Mendez acknowledged that there may have been an incident during which rocks were thrown or shots fired at her home. She remembered that Pepin feared for his own life and that of his family.

> JM:   Yeah, he, he got rid of us. He go rid of me and my daughter.
>
> DB [David Barrett]:   Uh-huh.
>
> JM:   He said I don't want anything to happen to y'all. If something happens, then it happens to me alone. And that's my daughter. And he hang out with me.
>
> DB:   Okay.

*3.    Exculpatory Portions of Pepin's Out-of-Court Statements*

Pepin spoke to various law enforcement agents numerous times, both in person and over the telephone. Throughout his various statements are scattered bits of information that might permit a rational jury, considering all the evidence, to conclude that Pepin reasonably believed that he was acting in self defense when he killed Rosario and Madrid.

Pepin's statements mention Rosario being the leader of a gang which stole money and drugs from traffickers, kidnapping them and invading their homes. Pepin told his interrogators that Rosario, who owed him approximately $14,000, became very angry when Pepin refused to lend Rosario $5,000 to repair his car. The defense will seek to prove that Rosario was so irritated by Pepin's refusal to give him more cash that he told Nelo to steal Pepin's drugs and kill him.

Pepin's testimony, should he ultimately decide to testify, and his prior statements to law enforcement, bear on his state of mind at the critical point of the killings. Pepin repeatedly declared that when Rosario stood up to "jump" him, Pepin shot him in the face.

Pepin also made various statements about Madrid. He declared that Madrid and he quarreled because, after Pepin's arrest on drug charges, Madrid was reluctant to provide Pepin with drugs to sell. Because Madrid had access to hired killers, Mendez had became alarmed when she saw some menacing men in a car parked outside their residence and hysterically called Pepin. One of the men had thrown a rock at their home. Pepin subsequently demanded that Madrid stop harassing his family. Madrid laughingly dismissed Pepin's complaints, but there was apparently some residual fear of Madrid in Pepin's family.

## B.    *Prosecution*

The government's view of the case is quite different. It reflects a defendant aggressively seeking out two drug associates, Rosario and Madrid, intending to kill them, and then deliberately murdering them. If they turned on him, he had ample opportunity to avoid immediate danger to himself and his family without killing.

*1.    José Rosario*

13

To facilitate his drug business, Pepin used a false name to rent an apartment at Sherman Avenue in the Bronx. He did not live in the apartment. Rather, Pepin and his workers, including George Loyola, sold Pepin's drugs from that location. Pepin paid Loyola between $200 and $300 a week to sell cocaine. Pepin would not let Loyola hold a large quantity of drugs at any given time. Instead, each time Loyola ran out of the product, he would call Pepin, who would then go to the Sherman Avenue apartment and replenish Loyola's supply. Whenever a customer wanted to purchase a large quantity of cocaine, Loyola would contact Pepin, who would personally handle the sale.

Pepin obtained some of his drugs from Rosario. Rosario would rob drug dealers and give the stolen drugs to Pepin. Pepin would sell the stolen drugs and share the proceeds with Rosario. Rosario worked with a man called "Nelo."

One day in 1992, Nelo came to the Sherman Avenue apartment when both Loyola and Pepin were present. Nelo told Pepin that Rosario had sent him to the apartment to kill Pepin and steal his drugs and money. The next day, September 17, 1992, Rosario came to see Pepin at the apartment.

Once inside the apartment, Rosario sat on a couch in the living room. Pepin went to the bathroom and summoned Loyola. Pepin then showed Loyola a .22 caliber revolver and the two men returned to the living room. While brandishing the revolver, Pepin asked Rosario if he had intended to kill him. Rosario hesitated and started to rise from the couch. Pepin told Rosario that he was a piece of dirt and shot him several times.

After the shooting, Pepin told Loyola to help carry Rosario to the bathroom tub. When Loyola initially refused, Pepin threatened to shoot Loyola. After they put Rosario in the tub, Pepin told Loyola to leave; Pepin would page him when he was needed. As Loyola was leaving,

he and Pepin heard moaning from the bathroom. Pepin exclaimed, the "son of a bitch" is still alive. He returned to the bathroom and cut Rosario's throat so that Rosario would bleed to death.

Pepin stated in a signed confession dated October 15, 2002 that he traveled to the Sherman Avenue apartment for the purpose of killing Rosario:

> I told my wife Julia Mendez, her older brother George L. Loyola and my cousin Apolinar Tavares that Barrigata [Rosario] was planning on killing me. I told them that I had to kill him before he kills me. I told George that when Barragita comes by the apartment at 1151 Sherman Ave., tell him that I have some money for him, I then want you to beep me with the code 000 in my beeper. That will tell me that Barrigata is at the apartment. I will then come over and I will kill him. One day I got beeped with the code 000, I knew that George had Barragitta in apt 12A at 1161 Sherman Ave. I then told my wife Julia who told me I had to be a man. I then left the apartment at Crescent Ave and I headed to 1161 Sherman Ave. to kill Barrigata. Once I got to [sic] I entered the apartment and I noticed Barrigata seating [sic] on the couch in the living room. . . . I walked into the bedroom, when I came out of the bedroom I had a 22 cal pistol. . . . Barrigita was still sitting on the couch, I told him I was going to kill him. Barrigita started to rise up off of the couch, I then pointed the gun at him and I shot him, I think 4 times, one was in the right eye I think, one was in the neck, where the other shot went. . . . [M]yself and George dragged Barrigita into the bathroom and put him in the tub. I put a cut into his neck so the blood would drain out. I then left to go to my house. . . . when I got home I ate and I told my wife Julia that I killed Barrigita and that I had to go back and cut up his body.

The government argues that before Pepin went to meet Rosario, he could not have reasonably believed that he was in immediate danger of unlawful bodily harm from Rosario. It contends that a defendant cannot seek out his adversary, kill him, and then claim that he is not guilty of murder because he acted in self defense. This is not a case where a defendant happened upon his adversary and then acted to protect himself rather than run away. There can be no valid issue of a duty to retreat where, the government contends, Pepin purposely traveled to his adversary's location to kill him. Pepin responds by arguing that he did not have a "duty to retreat" from Rosario because "a duty to retreat arises only when a person is confronted with an imminent threat."

15

The government points to the following facts which it argues seriously undermine Pepin's request for a self defense instruction: (1) Pepin traveled to where Rosario was located, (2) Pepin brandished a gun when he confronted Rosario, (3) Rosario attempted to rise from the couch in response to Pepin's actions, (4) Rosario was unarmed, (5) Pepin fired multiple shots at Rosario, and (6) long after Rosario was disabled, Pepin slit his throat in order to ensure that Rosario died. Even assuming that Rosario's attempt to rise constituted an immediate threat of serious bodily harm to Pepin, the government urges, he is precluded from relying on self defense because he initiated the confrontation that led to the threat.

2.    *Carlos Madrid*

In approximately September 1995, Pepin and Mendez went to Carlos Madrid's house in Queens where Pepin asked Madrid for money. Despite Pepin's entreaties, Madrid gave him only $20. On the way home Pepin's car hit a guardrail. Pepin was upset and said that Madrid was going to have to pay.

By October 1995, Mendez had separated from Pepin and moved in with her sister. Pepin was attempting to reconcile. On October 5, 1995, he picked up Mendez at her sister's home on the pretext that he wanted to take her to dinner. Pepin drove Mendez to his house on Beach Avenue in the Bronx.

Unbeknownst to Mendez, Pepin had requested that Madrid come to the Beach Street house, purportedly so that Pepin could purchase drugs from Madrid. Madrid drove to Pepin's house on Beach Street with two to three kilograms of cocaine. Shortly after Pepin and Mendez arrived at the house, the front doorbell rang. Mendez heard Madrid speaking with Pepin. Pepin brought Madrid into the bedroom to greet Mendez. Mendez observed that Madrid had a black knapsack with him, similar to the kind Madrid used to transport cocaine. Soon afterwards, Pepin

16

said to Madrid in substance, "Come on, let's make the deal." Then Pepin and Madrid left the bedroom.

After the men left the room, Mendez heard a few loud booming noises which did not sound like gunshots. What Mendez soon learned was that she had heard the sound of Pepin cracking open Madrid's head with a blunt instrument. Pepin also stabbed Madrid.

In a July 31, 2002 telephone conversation with law enforcement officers, Pepin stated that he lured Madrid to Pepin's home upon the pretext of a drug deal for the purpose of killing Madrid:

I killed him [Madrid] because he owed me almost $80,000.

\* \* \*

. . . One day [Madrid] give me, he give me one kilo. . . . I give half the money to him for the kilo for the drugs, and I said, I talked to Julia, "If this guy no wanna pay my money, I'm gonna kill him." So, uh I told him one day, "Julia, we go to the apartment Beach Avenue, . . . 1325 Beach Avenue," [I] say, "We go to the apartment, and you're gonna call him, and you're gonna call him and say he bring . . . more drug," and told him "I got the money here for the kilo. He give it to me, I give half first, he get $10,000 first and have . . . another $10,000, you know?" And told him "Bring, uh five more kilos." So we, uh, spoke to him, we told him I was there, you know. When he said, "Oh, I go to Manhattan, I send eh you know, I have only 20 kilos, I'd be I send over there. I only have two kilos, I give it to you two kilos." So he come into my house to [deliver] the two kilos, so and we kill him.

The government argues that there is no evidence to support a finding that Madrid threatened Pepin before he was killed. Such a verbal threat in and of itself would not constitute the immediate danger of unlawful bodily harm required of lawful self defense, especially since only Pepin possessed a weapon. After Pepin disabled Madrid by cracking his skull with a hammer, Pepin killed Madrid by stabbing him in the chest. The government contends that the stabbing could not have been in self defense since at that time Madrid posed no threat to Pepin.

## III.    Law

The law of self defense requires the defendant to swallow the sword of admission of the killing.  Exercising this ploy is dangerous.  In considering the evidence, much leeway will be permitted to defendant in proving his state of mind without contravening the laws of hearsay.  What he believed may have been based on untruths that others told, his own misconceptions and even self-deception based upon his believing what was in his interest to believe to justify his acts.

The defendant is entitled to a self defense instruction if there is evidence upon which the jury could rationally sustain the defense.  United States v. Jackson, 726 F.2d 1466, 1468 (9th Cir. 1984).  A mere "scintilla of evidence," however, is insufficient to require the instruction.  Id.  After the defendant has raised self defense, the government bears the burden of disproving it beyond a reasonable doubt.  United States v. Thomas, 34 F.3d 44, 47 (2d Cir. 2001).

Common law defines self defense rules in this federal prosecution.  See United States v. Butler, 485 F.3d 569, 572 n. 1 (10th Cir. 2007) (noting that the justification defense has been developed "by drawing on common law").  Self defense has its roots in natural law and was established as a legal defense by a 1534 English statute.  See New Jersey v. Goldberg, 79 A.2d 702, 705 (N.J. Super. Ct. App. Div. 1951) (discussing common law history of self defense); 2 Wharton's Criminal Law § 127 (15th ed.) (discussing self defense generally).  It is now universally adopted by all jurisdictions in the United States.  See id.  Generally, a person may use self defense to justify the use of physical force against another when he or she "reasonably" believes that at the time such force was used, he or she was in imminent danger of losing his life or suffering great bodily harm at the hands of other.  Id.; see also Wayne R. LaFave, 2 Subst. Crim. L. § 10.4 (2d ed.) ("One who is not the aggressor in an encounter is justified in using a

18

reasonable amount of force against his adversary when he reasonably believes (a) that he is in immediate danger of unlawful bodily harm from his adversary and (b) that the use of such force is necessary to avoid this danger.") (emphasis added).

Although the American Law Institute's Model Penal Code does not require that the person's belief in using self defense be reasonable, see Model Penal Code § 3.04(1), most jurisdictions require a "reasonable belief" on part of the defendant. See Peter D. W. Heberling, Justification: The Impact of the Model Penal Code on Statutory Reform, 75 Colum. L. Rev. 914 (1975); see also United States v. Farrow, 198 F.3d 179, 186-87 (6th Cir. 1999) (defendant's mistake but reasonable belief that men approaching his car meant to do him harm would have provided an innocent reason for his actions); 2 Wharton's Criminal law § 127 n.69 (15th ed.) (collecting cases on reasonable belief).

The Court of Appeals for the Second Circuit has noted that it is appropriate to look to state law for guidance on issues of self defense. See United States v. Desinor, 525 F.3d 193, 199 (2d Cir. 2008) (citing Wallace v. United States, 162 U.S. 466, 471-73 (1896). New York state (1) distinguishes between physical force and deadly physical force; (2) has a subjective and objective component to defendant's belief; (3) requires a duty to retreat in limited circumstances before the defendant uses deadly physical force; and (4) limits on an initial aggressor's use of deadly physical force:

> 1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself . . . or a third person from what he . . . reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless:
>
> > (a) The latter's conduct was provoked by the actor with intent to cause physical injury to another person; or

19

(b) The actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force; or

. . . .

2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

(a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating; except that the actor is under no duty to retreat if he or she is:

(i) in his or her dwelling and not the initial aggressor; . . .

. . . .

(b) He or she reasonably believes that such other person is committing or attempting to commit a kidnapping, forcible rape, forcible criminal sexual act or robbery; or

. . . .

N.Y. Penal Law § 35.15. See also Jackson v. Edwards, 404 F.3d 612, 623 (2d Cir. 2005) ("The fact-finder must determine that the defendant believed deadly physical force was necessary and that a reasonable person would have believed the use of deadly physical force was necessary under the same circumstances. New York law also imposes a duty to retreat in some circumstances: If a defendant who is confronted with deadly physical force knows he can retreat with complete safety but fails to do so, the justification defense is lost.") (citations omitted).

The Court of Appeals for the Second Circuit recently discussed an initial aggressor's duty to withdraw before using deadly physical force. See Desinor, 525 F.3d 193. In Desinor, the defendants entered the housing complex of a competing drug dealer to kill him and his affiliates

20

over a drug territory dispute. Id. at 196. The court noted that "it is undisputable that [defendants] were the initial aggressors when they entered [the housing complex of their rival] armed, respectively, with a handgun and a shotgun, for the purpose of killing [the rival] and possibly other members of his crew. Id. at 199. When the defendants saw an affiliate "burst through the door" and reach for what the defendants thought was a gun, the defendants shot and killed him. Id. The trial court refused to instruct the jury on self defense. Id. Relying on state court decisions, the Court of Appeals for the Second Circuit approved a requirement of withdrawal from the dangerous situation the shooter had deliberately created before the right to self defense could be exercised:

> Those decisions suggest that a defendant who initiates a violent crime, such as an armed robbery, that results in a fatal shooting may not claim self-defense absent a showing that, at the time the shooting occurred, the dangerous situation created by the initial crime had dissipated. The loss of this right holds even if the defendant, in good faith, withdraws from the immediate confrontation and communicates that withdrawal. As long as the defendant remains engaged in the perpetration or attempted perpetration of the crime that he initiated, "he cannot be excused for taking the life of his antagonist to save his own. In such a case it may be rightfully and truthfully said that he brought the necessity upon himself by his own criminal conduct."
>
> As evidence that the dangerous situation created by a defendant's initial crime persisted, courts in armed robbery cases have cited the fact that the defendant was still inside the robbed premises at the time of the shooting and that his gun was always in his hand, prepared to shoot.
>
> From this body of law, we conclude in this case that before defendants could obtain a jury instruction on self-defense, they must offer evidence from which a jury could find not only that [they] had demonstrably withdrawn from the immediate confrontation with [the victim], but also that the dangerous situation created by their initial undertaking to kill [the drug dealer] no longer existed. Defendants have not met that burden. . . .

Id. at 199-200 (citations omitted).

The court noted, "it has long been accepted that one cannot support a claim of self defense by a self-generated necessity to kill. The right of homicidal self defense is denied to slayers who incite the fatal attack." Id. at 198. A defendant who initiates a violent crime resulting in a fatal shooting may not claim self defense absent a showing that, at the time the shooting occurred, the dangerous situation created by the initial crime had dissipated. Id. at 199 (quotation marks omitted); see also United States v. Thomas, 34 F.3d 44, 48 (2d Cir. 1994) ("One who commits or attempts a robbery armed with deadly force, and kills the intended victim when the victim responds with force to the robbery attempt, may not avail himself of the defense of self-defense."); N.Y. Penal Law § 35.15(1)(b) N.Y. Penal Law § 35.15(1)(b) (providing an exception permitting an initial aggressor to claim self defense "if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident").

## IV. Application of Law to Facts

Given the capital nature of the penalty, there appears to be sufficient evidence that Pepin had not deliberately courted the dangerous situations when he purportedly acted in self defense in killing Rosario and Madrid. The government concedes that Rosario had hired Nelo to kill Pepin and steal his drugs and that Rosario voluntarily came to the Sherman Avenue apartment. An issue remains on how Rosario stood up from his seat when Pepin confronted him with the charge that Rosario had hired Nelo to kill him. It is not clear what Rosario's intent was when he stood up, what Pepin thought was Rosario's intent, whether Rosario had the means to kill Pepin at that point, and what Pepin thought Rosario's means were. Pepin's intent when Rosario sat across from him is open to interpretation. These questions are for the jury.

22

As to the killing of Madrid, there appears to be barely sufficient evidence which might lead a jury to rationally conclude that Pepin acted in self defense. The government's witness, Mendez, had told Loyola that Madrid had come to Pepin's and Mendez's apartment and that there was a dispute about drugs. The defense expects to adduce testimony from Mendez that Madrid had been demanding money from Pepin and threatening to kill or kidnap her and their daughter if Pepin failed to pay him. As to what transpired in the kitchen between Pepin and Madrid at the moment of killing, the facts are murky. The trier must decide.

The defense may argue in its opening that Pepin killed in self defense. Supporting evidence may be submitted to the jury. A self defense instruction to the jury will only be provided if the evidence shows that a reasonable jury could find that the defendant was acting in self defense.

## V.    Charge

In providing the court with requests to charge on self defense, the parties should consider the basic modern Federal Jury Instruction:

> A homicide is justified when committed by a person when he honestly, and in good faith, believes that he or another person is in imminent danger of harm or serious bodily injury from his assailant, and thus it is necessary to use such force to prevent the danger, including force which might cause the death of his adversary, and his belief is based upon reasonable grounds.

> The law of self-defense is founded upon the principle of necessity, real or apparent. In other words, it is not required that the defendant be in actual danger or great bodily injury. If he honestly and reasonably believes that he is in apparent imminent danger, that his life or the life of another person is about to be taken or that there is a danger of serious bodily harm, that is sufficient.

> However, a mere belief of the defendant that such danger exists is not sufficient to justify the killing. The reason for this is evident. If it were simply a matter of mere belief, then any persons committing homicide could contend that they believed they were justified in the killing, and the law requires that there must be reasonable grounds for such belief, based upon the conduct of the victim

and all the facts and circumstances surrounding and preceding the encounter and the relationship between the person killed and the defendant.

The question is: would a reasonable person faced with the same facts and circumstances which confronted the defendant at the time of their occurrence, have believed that he was in imminent danger of death or grievous bodily injury, such that it was necessary for him to use in his defense in order to avoid such death or injury, the force or means which might cause the death of his assailant?

You are reminded that the burden of proof remains at all times on the government, and that the defendant need not call any witnesses, nor offer any evidence. Thus, before you may convict, you must find beyond a reasonable doubt that the government has satisfied its burden of proving that the defendant did not act in self-defense. Therefore, if you have a reasonable doubt whether or not the defendant acted in self-defense, your verdict must be not guilty.

1 Leonard B. Sand et al, Modern Federal Jury Instructions (Criminal) § 8-9 (2007).

As Sand points, out "no matter how weak the proof may be, if there is some evidence that the defendant was acting in self-defense, a charge on that issue should be given." Id., comment at 8-62 (footnote omitted).

The court will consider the following additions to the Sand charge:

If the defendant had reasonable grounds to believe and actually did believe that he was in immediate danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he would be justified in using deadly force in self defense, even though it may afterwards have turned out that the appearances were false. If these requirements are met he could use deadly force even though there was neither purpose on the part of the other person to kill him or do him serious bodily harm, nor imminent danger that it would be done, nor actual necessity that deadly force be used in self defense.

Id., comment at 8-63.

. . . If a Defendant brings about the necessity of using force against another, by provoking the other's use or attempted use of unlawful force against him, he cannot claim that his use of force was justified by reason of self-defense, unless he abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter and the other nevertheless continues or attempts to use unlawful force against him.

. . . [I]f you believe from the evidence in this case beyond a reasonable doubt that the Defendant brought about the necessity of using force against [ a

24

deceased] by provoking [the deceased's] use or attempted use of force against him so that he, the Defendant, might then use deadly force against [the deceased], if he did, you will not hold in favor of the Defendant on the issue of self-defense.

. . . [I]f you have a reasonable doubt that the defendant did intend to provoke the difficulty or did intend to provoke the use of force by [the deceased], or if you have a reasonable doubt that the Defendant abandoned the encounter or clearly communicated to [the deceased] his intent to abandon the encounter reasonably believing he could not safely abandon the encounter, but [the deceased] nevertheless continued or attempted to use unlawful force against him, the . . . Defendant, then the Defendant's right of self-defense is not [reduced] and you will decide the issue of self-defense in accordance with the law on that subject . . . .

Id., comment at 8-63 n. 7.

These charges appear to be congruent with the Supreme Court's traditional views. See, e.g., Beard v. United States, 158 U.S. 550 (1895). The American Law Institute's proposal and New York's charges are more complex than the circumstances of this case appear to require. See American Law Institute, Model Penal Code and Commentaries § 304 (1985); Comments and Proposed Charge New York Pattern Jury Instructions, Criminal, N.Y. Penal Law § 35.15. The parties shall provide appropriate proposed charges with supporting briefs.

## VI.    Conclusion

Since defendant has consented to reliance on self defense, he will be permitted to argue self defense on the opening. Evidence relating to the defense will be permitted. An appropriate self defense charge will be given only if a case has been made out for it.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: Brooklyn, New York
July 14, 2008

25