

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

HUMBERTO PEPIN TAVERAS,
also known as "Tony"
and "Luis Rosario"

Defendant.

MEMORANDUM AND ORDER
SENTENCING PHASE JURY –
EXCLUDING EVIDENCE
FROM GUILT PHASE

04-CR-156 (JBW)

JACK B. WEINSTEIN, Senior United States District Judge:

Contents

I. Introduction ........................................................................................................................... 2
II. Guilt Phase Proceedings and Prior Evidentiary Decisions .................................................... 3
   A. Pre-Trial Appellate Decision on the Admissibility of Post-Mortem Dismemberment Evidence During the Guilt Phase ................................................................................... 3
   B. Post-Mortem Dismemberment Evidence during Voir Dire and the Guilt Phase ............ 4
III. Exclusion of Post-Mortem Dismemberment Evidence at the Penalty Phase ....................... 5
   A. Admission of Dismemberment Evidence Would Seriously Prejudice the Defendant ......... 5
   B. A Strong Instruction on the Dismemberment Evidence's Probative Force Might Confuse the Jury and Might Inappropriately Impose the Court's View ......................................... 6
IV. Ensuring that Dismemberment Evidence Will Not Be Considered by the Jury for Sentencing ............................................................................................................................. 8
   A. Use of Curative Instruction to Remedy the Jury's Exposure to Dismemberment Evidence 9
   B. Impaneling a New Penalty Phase Jury ............................................................................ 10
   C. Protecting Defendant's Fundamental Due Process Rights ............................................. 12
   D. Assessing the Present Jury's Ability to Decide the Sentence Without Considering the Excluded Evidence .......................................................................................................... 14
V. Conclusion ............................................................................................................................ 18

I. <u>Introduction</u>

Defendant has been found guilty by a death-qualified jury of two counts of knowingly and intentionally killing while engaged in a conspiracy to distribute and possess with intent to distribute a controlled substance, 21 U.S.C. § 841(b)(1)(A) and § 848(e)(1)(A), and one count of obstruction of justice by knowingly and intentionally using or attempting to use intimidation and physical force against another with the intent to hinder, delay or prevent the communication to law enforcement of information relating to the commission or possible commission of a federal offense, 18 U.S.C. § 1512(b)(3). The case has now proceeded to the penalty phase.

The defendant knowingly and intelligently waived his right to a possible sentence of a term of years that is less than life in prison without the possibility of release with respect to the two capital counts. *See* Trial Tr. 2015-19, Oct. 20, 2008. Only two sentences are now available: death by execution or life in prison without the possibility of release.

Before the trial began, the defendant had offered to enter a plea of guilty in exchange for a sentence of life in prison without release. The government rejected the offer, insisting on seeking the death penalty.

Introduced during the guilt phase was evidence of the post-mortem dismemberment of the victims, José Rosario and Carlos Madrid. The defendant used his skills as a former butcher to cut up the bodies of the deceased. He then put the parts in garbage bags and dumped them by the sides of roads.

The issue now posed is if and how dismemberment evidence – introduced at the guilt phase – may be used in the sentencing phase. For the reasons stated below, this evidence may not be considered by the sentencing jury.

## II. Guilt Phase Proceedings and Prior Evidentiary Decisions

### A. Pre-Trial Appellate Decision on the Admissibility of Post-Mortem Dismemberment Evidence During the Guilt Phase

Prior to trial, the court ruled that the evidence of post-mortem dismemberment would be excluded as prejudicial during the penalty phase and – because the same jury might decide both the guilt and penalty phases – such evidence would not be received at the guilt phase. *See United States v. Taveras*, 436 F. Supp. 2d 493, 515-16 (E.D.N.Y. 2006). During the penalty phase, the court's authority to exclude prejudicial evidence is greater than it is during the guilt phase. *Id.* at 500-01 (noting that the Federal Death Penalty Act ("FDPA") provides that the standard for excluding prejudicial evidence is lower during the penalty phase than during the guilt phase); *compare* 18 U.S.C. § 3593(c) ("[evidence in the penalty phase] may be excluded if its probative value is *outweighed* by the danger of creating unfair prejudice, confusing the issues, or misleading the jury") (emphasis added) *with* Fed. R. Evid. 403 ("evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice") (emphasis added); *see also United States v. Sampson*, 335 F. Supp. 2d 166, 177 (D. Mass. 2004) (finding that the FDPA's penalty phase provisions confer greater power to exclude prejudicial evidence than does Rule 403).

The government appealed. Affirmed were some aspects of the trial court's ruling excluding prejudicial evidence. *See United States v. Pepin*, 514 F.3d 193, 204 (2d Cir. 2008) (upholding the exclusion of evidence of child abuse and a child endangerment conviction). With respect to post-mortem dismemberment evidence, the Court of Appeals for the Second Circuit ruled that it was admissible at the guilt phase. It left open the trial court's discretion to deal with this evidence at the sentencing phase:

3

> The government also asks us to decide that evidence of
> dismemberment must be permitted at the penalty phase. We
> decline to do so. Much will have happened between now and then,
> particularly the likely use of evidence of dismemberment at the
> guilt phase. We cannot know with anything approaching certainty
> what the precise issue before the court will be if and when it
> actually is framed. We therefore vacate the order now in force
> barring dismemberment evidence from the penalty phase. *Should
> these proceedings enter a penalty phase, we leave it to the district
> court at that time – in light of the views expressed in this opinion
> and in the district court's sound discretion – to enter an order as to
> the admissibility of such evidence.*

*Id.* at 209 (emphasis added).

B. <u>Post-Mortem Dismemberment Evidence during Voir Dire and the Guilt Phase</u>

During jury selection, it became apparent that dismemberment evidence would have a significant emotional impact on the jurors. Several prospective jurors stated during oral voir dire or in their written jury questionnaires that they consider dismemberment to be particularly gruesome. Some equated it to cannibalism. *See, e.g.*, Voir Dire Tr. 325, Sept. 23, 2008 ("[Dismemberment is] excessive. It's almost like cannibalism."); Voir Dire Tr. 926, Sept. 29, 2008 ("[Dismemberment is] really inhumane. It's just the worst thing that could ever be"); Voir Dire Tr. 954, Sept. 29, 2008 ("Dismemberment is kind of – eeks me a little").

At the guilt phase, dismemberment evidence figured prominently in the government's case. Repeated references were made to the cutting up of the corpses. In its summation, the government highlighted the gory details of the defendant's actions after the murders:

> [A]fter [the defendant] brutally executed these two men, this
> former butcher from the Dominican Republic called upon his prior
> skills. Took out a big butcher knife (indicating), hacked up their
> bodies into pieces. And after he was done, stuffed them into trash
> bags. He loaded those bags with those guy's bodies in them, into
> his car and drove off far away from the scene of the crime, the
> scene of his brutal murders.

4

Trial Tr. 1824, Oct. 16, 2008. *See also* Trial Tr. 1831 (defendant "proceeded to chop him up"); Trial Tr. 1833 ("[W]hen he's chopping up the body, he walks out carrying one of José Rosario's arms"); Trial Tr. 1852 ("He carved up José Rosario's and Carlos Madrid's bodies and stuffed them into the trash bags and hauled them off"); Trial Tr. 1862 ("He let Rosario bleed to death in that bathtub, knowing that he couldn't carve him up until all the blood was drained out of him …. Comes back, buys some supplies. Uses those skills as a butcher to cut up Rosario's body."); Trial Tr. 1867 ("[H]e calmly and neatly carved up their bodies into pieces, stuffed them in bags and carted them off."); Trial Tr. 1861-62 ("Dismembers Rosario's body, plain and simple …. The defendant calmly dismembered Rosario's body after killing him.").

The disturbing impact on the jury was apparent. *See* Hr'g Tr. 1801-05, Oct. 15, 2008.

III. <u>Exclusion of Post-Mortem Dismemberment Evidence at the Penalty Phase</u>

   A. <u>Admission of Dismemberment Evidence Would Seriously Prejudice the Defendant</u>

The weighing of prejudicial evidence during the penalty phase of a capital trial for purposes of admissibility requires a different scale from that used during criminal proceedings generally. *Compare* 18 U.S.C. § 3593(c) *with* Fed. R. Evid. 403. A court is required at the sentencing stage to robustly exclude evidence that may have a prejudicial effect on the defendant:

> The FDPA does not eliminate [the] function of the judge as gatekeeper of constitutionally permissible evidence; nor does it alter or eliminate the constitutional baseline for the admissibility of evidence in a criminal trial. To the contrary, under the FDPA [s]tandard, judges continue their role as evidentiary gatekeepers and, pursuant to the balancing test set forth in § 3593(c), retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair.

*United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004) (citations, internal quotation marks, and brackets omitted).

Based on the dismemberment evidence presented at the guilt phase and this court's observations of its impact on the jury, allowing its admission and consideration during the penalty phase would violate section 3593(c) of the FDPA. *See supra* Part II.B. It is likely that this evidence would have an excessive impact on the finding and weighing of aggravating and mitigating factors. *See* 18 U.S.C. §§ 3592-3593; *see also Taveras*, 436 F. Supp. 2d at 515 ("The court has a duty to minimize the 'risk [of] a verdict impermissibly based on passion, not deliberation.'" (quoting *Payne v. Tennessee*, 501 U.S. 808, 836 (1991) (Souter, J., concurring)).

Given the circumstances, three alternatives are available: first, a strong instruction on the dangers of the excessive and prejudicial effect of dismemberment evidence on the sentencing decision; second, exclusion of this evidence with an instruction to the jury not to consider it; and third, impaneling of a new death-qualified jury that will not have heard the dismemberment evidence.

### B. A Strong Instruction on the Dismemberment Evidence's Probative Force Might Confuse the Jury and Might Inappropriately Impose the Court's View

Trial judges may provide instructions and comments to a jury to ensure adequate understanding of the law and its application. *See* Essay, *The Power and Duty of Federal Judges to Marshall and Comment on the Evidence in Jury Trials and Some Suggestions on Charging Juries*, 118 F.R.D. 161 (1988). "An important cautionary guideline is that a judge should in most circumstances avoid expressing any opinion as to his views on the ultimate outcome of the case. This is always true in criminal trials." *Id.* at 180. Prudence is particularly desirable in a capital trial.

Following the guilt phase, the court proposed the following penalty phase jury charge instructing the jury of the limited probative force of post-mortem dismemberment evidence:

> You will recall the extensive evidence on the dismemberment of the cadavers by the defendant, the packing up of the body parts in garbage bags, and the disposal of them by dumping. This evidence was admitted during the guilt phase because it was closely related to the actual killings and might bear on the issue of intent.
>
> Dismemberment of a dead person is highly repugnant and repulsive. Being a post-killing event, its relevance to dangerousness of future killings or assaultive behavior in deciding the issue of whether the punishment should be death or life imprisonment without parole has limited probative force. It is subject to overvaluation and creation of prejudice.
>
> For purposes of assessing a penalty, it would be inappropriate, in the court's opinion – but your opinion is decisive – to consider the dismemberment factor. It might inadvertently turn a multiple killing by one drug dealer of two of his associates over drug-related disputes into a most gruesome and abhorrent killing worthy of the most extreme penalty possible.
>
> Yours is a most difficult decision. I make these comments with respect to an issue which is probably on the minds of all of us and most difficult to deal with in this penalty phase. The issue of penalty is, as I have said, for you to decide, not the court.

Ct. Exh. 23, Portion of Proposed Penalty Phase Jury Charge, Oct. 15, 2008; *see also* Hr'g Tr. 1759, 1796-1810, Oct. 15, 2008.

Upon objection by the government, the court suggested the following modified instruction:

> Evidence of post-killing dismemberment was admitted during the guilt phase because it was closely related in time to the actual killings and might bear on the issue of intent. Now that we are in the penalty phase, this evidence is subject to overvaluation and creation of prejudice.

7

> For purposes of assessing a penalty, it would be inappropriate, in the court's opinion – but your opinion is decisive – to now give substantial weight to dismemberment evidence.
>
> Yours is a most difficult decision. I make these comments with respect to an issue which is probably on the minds of all of us and most difficult to deal with in this penalty phase. The issue of penalty is, as I have said, for you to decide, not the court.

Ct. Exh. 5, Portion of Proposed Penalty Phase Jury Charge, Oct. 20, 2008; *see also* Hr'g Tr. 1995-2008, Oct. 20, 2008.

Even this modified change is subject to reproof. Congress has afforded juries enormous and independent responsibility for deciding the sentence in a capital case. Whether a defendant may be put to death by the state is placed squarely in the jury's hands. *See* 21 U.S.C. §§ 3591-3594; *cf. Ring v. Arizona*, 536 U.S. 584, 619 (Breyer, J., concurring) (concluding that "the Eighth Amendment requires individual jurors to make, and to take responsibility for, a decision to sentence a person to death"). The jury's duties are complex. They include the finding and weighing of aggravating and mitigating factors and the completion of a complicated special verdict form. A strong instruction by the court to limit the probative force of evidence would complicate the jury's deliberations and might well be construed as suggesting to the jury what outcome the court favors.

In this case, a judicial comment on what probative force to give this evidence would be inappropriate. A more expedient approach is to exclude the dismemberment evidence for the penalty phase. How that may best be accomplished is not clear from the statute and judicial precedents.

IV. Ensuring that Dismemberment Evidence Will Not Be Considered by the Jury for Sentencing

8

A. Use of Curative Instruction to Remedy the Jury's Exposure to Dismemberment Evidence

Where the jury is tainted by exposure to improper or prejudicial statements, behavior, or evidence, curative jury instructions should be considered as a remedy. An instruction to exclude the post-mortem dismemberment evidence would be appropriate only if the court were confident that it would not be futile. If it became apparent that the jury would be unable to follow the court's instruction to exclude dismemberment evidence, the court would be required to consider alternative measures to safeguard the defendant's right to a fair trial.

Curative instructions may be in some cases "very close to an instruction to unring a bell." *United States v. Murray*, 784 F.2d 188 (6th Cir. 1986); *see also Bruton v. United States*, 391 U.S. 123 (1968) ("Limiting instructions to the jury may not in fact erase the prejudice"). Judge Learned Hand observed that a limiting instruction under some circumstances may be "a recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." *Nash v. United States*, 54 F.2d 1006 (2d Cir. 1932).

Yet, our criminal justice system relies upon the "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (internal citation omitted). Where a jury has been exposed to inadmissible evidence, "[w]e normally presume that a jury will follow an instruction to disregard [such] evidence . . . unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) (internal citations omitted).

The Supreme Court's assumption in *Richardson v. Marsh* that juries "follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true

9

than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." 481 U.S. at 221. Courts have regularly applied the *Richardson* presumption in capital cases. *See, e.g., United States v. Sampson*, 486 F.3d 13, 43-44 (1st Cir. 2007) ("The upshot is that the district court's handling of gruesomeness concerns ... demonstrated a thoughtful consideration of potential prejudice. The court excluded much evidence, redacted other evidence, gave appropriate limiting instructions, and saw to it that admitted photographs were displayed circumspectly to the jury."); *United States v. Brown*, 441 F.3d 1330, 1354-56 (11th Cir. 2006) (holding that a misstatement of the law regarding mitigating factors during voir dire was effectively cured by the court's explicit penalty phase jury instructions on mitigating factors); *United States v. Casas*, 425 F.3d 23, 50 (1st Cir. 2005) (in a joint trial, "[t]he court took adequate measures to guard against spillover prejudice by instructing the jury to consider each charged offense, and any evidence relating to it, separately as to each defendant"); *United States v. Taylor*, Docket No. 04-160, 2008 WL 4510262 (E.D. Tenn. Oct. 2, 2008) (where prejudicial information about the case was featured prominently in the media the day before the penalty phase was to start, the district court held an individual voir dire with each juror to assess whether and to what extent they had been exposed to the reports and concluded that any prejudice could be remedied with a curative instruction).

Nevertheless, "death is different." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) ("the penalty of death is qualitatively different from a sentence of imprisonment"). There is a heightened need for reliability in the sentencing of a capital defendant. *See infra* Part IV.C.

B. Impaneling a New Penalty Phase Jury

The statute dealing with the capital penalty phase provides that the sentencing "hearing shall be conducted ... before the jury that determined the defendant's guilt" but that it may be heard "before a jury impaneled for the purpose of the [penalty phase] hearing *if ... the jury that determined the defendant's guilt was discharged for good cause.*" 18 U.S.C. § 3593(b)(2)(C) (emphasis added). If a guilt phase jury is exposed to evidence inadmissible at the penalty phase and if it will be unable to eliminate it from its consideration of whether to impose the death penalty, then there may be "good cause" warranting dismissal of the guilt phase jury and the impaneling of a new jury for the sentencing phase. See *id.*

When a juror or jury is exposed to evidence extrinsic to a criminal trial, a court has the discretion to discharge one or more jurors or to declare a mistrial and impanel a new jury for the proceeding. *See United States v. Thomas*, 116 F.3d 606, 613 (2d Cir. 1997) (observing that dismissals of jurors under the "good cause" provision in Federal Criminal Rule 23(b) "have been upheld repeatedly in cases where the trial court found that a juror was no longer capable of rendering an impartial verdict"). In a capital trial, exposure to unduly prejudicial extrinsic evidence heard by the all the jurors may constitute "good cause" for discharging a guilt phase jury prior to the penalty phase if it there is no other adequate remedy. *See Jones v. United States*, 527 U.S. 373, 418 (1999) (Ginsburg, J., dissenting) ("[d]ischarge for 'good cause' under § 3593(b)(2)(C) ... is most reasonably read to cover guilt-phase ... juror disqualification due to, *e.g., exposure to prejudicial extrinsic information*") (emphasis added); *id.* at 381 (majority op.) ("The phrase 'good cause' in § 3593(b)(2)(C) plainly encompasses events such as juror disqualification"). For example, "good cause" may exist if, between the two trial phases, members of a jury are "disqualified because of their exposure to outside influences." *United*

11

*States v. Williams*, 400 F.3d 277, 282 (5th Cir. 2005); *United States v. Young*, 424 F.3d 499, 506 (6th Cir. 2005) (citing *Williams*).

While the power to discharge the guilt phase jury exists, there are strong reasons not to utilize this option. Choosing this death-qualified jury required a panel of five hundred prospective jurors. Completion of a lengthy questionnaire lasted two days. Four days were needed to conduct individual questioning of almost two hundred jurors. Additional time was required to allow the parties to exercise peremptory challenges. The parties invested enormous effort outside of court in preparing for the jury selection process. Discharging the guilt phase jury would require the repetition of a full voir dire to obtain a new death-qualified jury. Much of the guilt phase evidence would need repeating, with added burdens on witnesses and the new jury. The process would be costly for the court and the parties. Discharge of the guilt phase jury should only be utilized if it is necessary to protect the defendant's right to a fair trial.

C. Protecting Defendant's Fundamental Due Process Rights

Weighing against cost and inconvenience is due process. The difficult issue of how to protect a defendant from prejudicial evidence at a capital trial's sentencing phase inevitably implicates the defendant's fundamental rights. "The Eighth Amendment entitles a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed." *Simmons v. South Carolina*, 512 U.S. 154, 172 (1994) (Souter, J., concurring); *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime") (citing *California v. Brown*, 479 U.S. 538 545 (1987) (O'Connor, J., concurring) (emphasis in original).

12

The Supreme Court has emphasized the heightened need for reliability in capital cases to ensure due process. *Woodson*, 428 U.S. at 305 ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). *See also Oregon v. Guzek*, 546 U.S. 517, 525 (2006) (noting that the Eighth Amendment insists upon "'reliability in the determination that death is the appropriate punishment in a specific case.'") (quoting *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (quoting *Woodson*)). The Eighth Amendment requirement of heightened reliability in capital sentencing applies to jury instructions. *See Simmons v. South Carolina*, 512 U.S. at 172 (Souter, J., concurring).

Moderating this due process concern is the recognition that "not every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial." *United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002):

> Due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.*

*United States v. Olano*, 507 U.S. 725, 738 (1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)) (emphasis added.)

Courts, while cognizant of due process requirements, have almost invariably conducted capital trials with a unitary jury through both phases. The Supreme Court has approved capital

13

proceedings in which "the same jurors who have the responsibility for determining guilt or innocence must also shoulder the burden of fixing the punishment. That is as it should be, for the two questions are necessarily interwoven." *Lockhart v. McCree*, 476 U.S. 162, 180-81 (1986) (quoting *Rector v. State*, 659 S.W.2d 168, 173 (Ark. 1983)). Where a curative instruction adequately remedies the problem of guilt phase evidence that is inadmissible for the penalty phase, a unitary jury remains the appropriate choice.

D. <u>Assessing the Present Jury's Ability to Decide the Sentence Without Considering the Excluded Evidence</u>

Given the disadvantages of other methods of avoiding prejudice to the defendant, the court has an obligation to seriously consider a flat instruction that the dismemberment evidence that jury has heard may not be part of the sentencing decision. The court's duty to force this reasoned determination "furthers the goals of the FDPA. If the federal courts have supervisory authority to 'formulate procedural rules not specifically required by the Constitution or the Congress' to 'preserve the integrity of the judiciary by ensuring that a conviction rests on appropriate considerations validly before the jury' ... that authority must extend to the sentencing phase of a trial as well." *United States v. Webster*, 162 F.3d 308, 339 (5th Cir. 1998) (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)). Continued service in the sentencing phase requires assurance that the jurors will be able to follow an instruction that evidence of post-mortem dismemberment and disposal not be considered in deciding the sentence.

To obtain that assurance, specific inquiry of each juror was made with respect to his or her individual ability to follow the court's instruction on excluded evidence. The parties were

allowed to propose language for this inquiry of the jurors. The government submitted the following language:

> Before you were selected as a juror in this case, you filled out a lengthy questionnaire and the lawyers and I then asked about your views on certain issues, including the death penalty. You may remember that I specifically asked you a series of questions about the second phase of the trial. I asked those questions to make sure you would be able to follow the Court's instructions, rather than deciding the case based on your own views about the death penalty. At that time, you assured me that you would follow my instructions about the law and the evidence in reaching your decision. Do you remember that?
>
> Because we are about to begin the penalty phase, I want to remind you of your obligation to follow my instructions, and address one particular piece of evidence that you heard about in the first phase of the trial. During the guilt phase, you heard evidence of post-killing dismemberment. This evidence was admitted because it was closely related in time to the actual killings and might bear on the issue of intent.
>
> Now that we are in the penalty phase, intent is no longer an issue. Thus, this evidence is subject to overvaluation and creation of prejudice. It would be inappropriate in this phase to give substantial weight to dismemberment evidence. To avoid doing so, you must follow my instructions. *Specifically, you may now consider evidence about post-killing dismemberment only to decide whether the government has proven certain specific aggravating factors beyond a reasonable doubt.* I will tell you about these aggravating factors later, but for now I am instructing you not to consider such evidence for any other purpose. *I am further instructing you not to give it any more weight than you give the other evidence presented in support of aggravating and mitigating factors.*
>
> Will you continue to follow the Court's instructions, putting aside all your biases, sympathy and other personal feelings, in deciding the appropriate punishment?

Ct. Exh. 4, Government Letter, Oct. 23, 2008 (emphasis added).

This proposed language was unsatisfactory. It wrongly assumed that the post-mortem dismemberment evidence could be admitted and considered for particular aspects of the penalty phase. It failed to respond to the difficulties identified by the court.

The court introduced the penalty phase when the jury reconvened after finding the defendant guilty. It instructed the jurors, seated together, on the exclusion of the dismemberment evidence:

> You have unanimously found the defendant, Humberto Pepin Taveras, guilty of the intentional killing of José Rosario and Carlos Madrid. You must now consider whether to sentence the defendant to death or to life in prison without the possibility of release.
>
> The law leaves this decision exclusively to you, the jury. The court is required to impose the sentence that you choose to impose. You must each individually decide whether to sentence the defendant to death or to life in prison without any possibility of release. If even one of you finds that punishing the defendant with life in prison without the possibility of release rather than death is appropriate, then he will be sentenced to life imprisonment without the possibility of release.
>
> I will give you detailed instructions regarding the weighing of aggravating and mitigating factors at the end of this part of the trial, before you begin your deliberations.
>
> You may consider any evidence that was presented during the first phase of the trial – with one exception: *evidence of dismemberment and disposal of body parts may not be considered in determining an appropriate sentence.* You may also consider any evidence that is presented in this sentencing phase.

Trial Tr. 2351-52, Oct. 29, 2008 (emphasis added).

It then called the jurors and alternates one at a time into the courtroom in order to avoid tainting the entire jury. Each was asked whether he or she would follow the court's instructions.

All jurors and alternates responded in the affirmative as follows:

16

The Court: Can you follow my instructions?
Juror 1: Yes, sir.
\*\*\*
The Court: Juror Two, will you follow my instructions?
Juror 2: Yes.
\*\*\*
The Court: Juror Three, will you follow my instructions?
Juror 3: Without question.
\*\*\*
The Court: Juror Four, will you follow my instructions?
Juror 4: Yes.
\*\*\*
The Court: Juror Five, will you follow my instructions?
Juror 5: Yes, I will.
\*\*\*
The Court: Juror Six, will you follow my instructions?
Juror 6: Yes.
\*\*\*
The Court: Juror Seven, will you follow my instructions?
Juror 7: Yes, sir.
\*\*\*
The Court: Juror Eight, will you follow my instructions?
Juror 8: Yes, I will, your Honor.
\*\*\*
The Court: Juror Nine, will you follow my instructions?
Juror 9: I will.
\*\*\*
The Court: Juror Ten, will you follow my instructions?
Juror 10: Yes, I will.
\*\*\*
The Court: Juror Eleven, will you follow my instructions?
Juror 11: Yes.
\*\*\*
The Court: Juror Twelve, will you follow my instructions?
Juror 12: Yes.
\*\*\*
The Court: Alternate One, will you follow my instructions?
Alternate Juror 1: Yes.
\*\*\*
The Court: Alternate Two, will you follow my instructions?
Alternate Juror 2: Yes.
\*\*\*
The Court: Alternate Three, will you follow my instructions?
Alternate Juror 3: Yes.

>    \*\*\*
>    The Court: Alternate Four, will you follow my instructions?
>    Alternate Juror 4: Yes.

Trial Tr. 2353-58, Oct. 29, 2008.

Following this individual voir dire and the unequivocal responses of the jurors, the jurors retired to the jury room. The court then asked the parties whether the jury was fit to determine the sentence to be imposed:

>    The court: Is the jury satisfactory?
>    Mr. Freedman [for the government]: It is, your honor.
>    Mr. Freeman [for the defendant]: Your Honor, it appeared that Juror No. 9 was going to ask a question. I would request that your Honor inquire of Juror Nine if he has something that bears on his ability to be fair and impartial in this case in light of your recent instructions.
>    The Court: I didn't notice that. Denied. Is the jury satisfactory?
>    Mr. Freeman: Yes.
>    The Court: [Are the] alternates satisfactory?
>    Mr. Freedman: Yes, your Honor.
>    Mr. Freeman: Yes.

Trial Tr. 2358, Oct. 29, 2008.

Based on the responses of the jurors and counsel and the court's observations of the jurors' demeanor, the court found the jury which had heard the evidence at the guilt phase qualified to decide the sentence.

V. Conclusion

The court finds that the post-mortem dismemberment is prejudicial. It does not meet the admissibility standard applied to the penalty phase. *See* 18 U.S.C. § 3593(c); *Pepin*, 514 F.3d at 209; *supra* Parts II.A, III.A. The present jury is capable of following the court's instructions not to consider the dismemberment evidence it heard during the guilt phase and of fairly deciding the appropriate sentence to be imposed. No post-mortem dismemberment evidence or direct or

18

indirect reference to it will be permitted during the penalty phase.

SO ORDERED.

/s/ Jack B. Weinstein

Jack B. Weinstein
Senior United States District Judge

Dated: Brooklyn, New York
November 4, 2008