| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | | FILED<br>IN CLERK'S OFFICE<br>U.S. DISTRICT COURT E.D.N.Y.<br>★ NOV 0 7 2008 ★<br>BROOKLYN OFFICE |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>HUMBERTO PEPIN TAVERAS,<br>also known as "Tony"<br>and "Luis Rosario"<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | AMENDED<br>MEMORANDUM AND<br>ORDER ON EVIDENCE<br>OF DEFENDANT'S GANG<br>MEMBERSHIP<br><br>04-CR-156 (JBW) |

JACK B. WEINSTEIN, Senior United States District Judge:

### Contents

I. Introduction ............................................................................................................................2
II. Evidence Presented at Trial ....................................................................................................3
   A. Testimony of Officer McBride ...........................................................................................3
   B. Testimony of Inmate X .......................................................................................................5
   C. Testimony of Dr. Michael Welner .......................................................................................9
III. Application of Law ...............................................................................................................11
   A. Evidentiary Rule for the Penalty Phase ............................................................................11
      1. Defendant's Association with Trinitarios and Dominicans as Evidence of Gang
         Membership ..............................................................................................................13
      2. Tattoos as Evidence of Gang Membership ...............................................................14
      3. Gang Membership as Evidence of Future Dangerousness .........................................15
   B. Race, Ethnicity, or National Origin as a Proxy for Dangerous Gang Activity ................16
   C. Special Precaution to Ensure Against Discrimination in the Sentencing Decision ........17
   D. Restricting the Role of Expert Witnesses as to Gang Membership .................................19
IV. Conclusion ............................................................................................................................20



I.  Introduction

In the penalty phase of this capital trial, the government charges that the defendant will constitute a serious danger to prison inmates and staff if he is sentenced to life in prison rather than death. In support, it argued that the defendant, a citizen of the Dominican Republic, is a member of the Trinitarios. Evidence at trial showed that the gang is composed primarily of Dominicans. The government contends that the Trinitarios is a violent prison gang.

Membership in a violent prison gang would support a finding of future dangerousness as a non-statutory aggravating factor for purposes of the jury's sentencing decision. *See* 18 U.S.C. §3593(a).

The jury will not be permitted to find that the defendant is a member of the Trinitarios. Proof of membership is ambiguous and of slight probative force. It is far outweighed by the dangers of ethnic prejudice and overvaluation.

The following limiting instructions were proposed by the court to direct the jury on how it could use the evidence it has heard on the subject of the Trinitarios:

> 1) The jury may not find that the defendant was or is a member of the Trinitarios.
>
> 2) The jury may not find that people from the Dominican Republic are more or less dangerous than other people in prison. The jury may not find that people from the Dominican Republic are more or less likely than other people to be members of a gang.
>
> 3) The jury may use evidence that the Trinitarios and other gangs exist in prison, which may make prison more dangerous to gang members and other individuals inside prison.

Trial Tr. 2882, Oct. 31, 2008.

The government expressed no opposition to the second and third instructions but objected to an instruction that the jury may not find that the defendant was or is a member of the Trinitarios. *See* Ct. Exh. 1, Government Letter, Nov. 3, 2008. The defendant approved all three proposed instructions. *See* Ct. Exh. 3, Government Letter, Nov. 4, 2008. The jury will not be permitted to find that the defendant was a member of the Trinitarios. For the reasons indicated below, it will be instructed as proposed above by the court.

II.     Evidence Presented at Trial

   A. Testimony of Officer McBride

The government called Officer Wayne D. McBride, an experienced Special Investigation Supervisor (SIS) technician at the Federal Correctional Institution (FCI) in Otisville, New York. McBride recalled investigating a weapons possession incident involving the defendant while the defendant was an inmate at the Otisville facility. He was unable to identify the defendant in person, but he claimed to remember the incident and other aspects of the defendant's conduct at FCI Otisville.

Extensive testimony was given by this witness about the discovery of potential weapons (razor blades) and other contraband in the defendant's prison quarters. He was then asked by the government whether he observed any specific gang-related activity with regard to the defendant. His responses emphasized the defendant's relationship with other Dominicans. For example, he stated: "We observed the inmate Pepin when he [came] to eat chow or anything like that *he would hang out with Dominican[s]* – what we would call a gang of Trinitarios." Trial Tr. 2423, Oct. 29, 2008 (emphasis added).

3

He continued to describe his knowledge of the Trinitarios at FCI Otisville and the defendant's alleged connection to – and possible leadership position within – that gang:

> Q: How are you familiar with the Trinitarios?
> A: Trinitarios is a gang that we watch. We watch numerous types of gangs in our facility. As of today we don't have many Trinitarios in our institution but we do have other [gangs] such as Latin Kings. We watch them all. Latin Kings, Trinitarios.
> Q: How are you able to identify individuals as being a member of the Trinitarios?
> A: They come right out and tell us when we ask them during intake screening.
> Q: Did Mr. Pepin ever tell you that he was a Trinitarios?
> A: No, he did not.
> Q: But did you observe other activities with regard to the defendant and known members of the Trinitarios?
> A: Yes, I have.

*Id.*

Reference was made to the witness's observations of the defendant in the prison cafeteria hall in the company of other Dominicans:

> A: [The defendant] would come in, go through the line, get his food, have a seat at the table. *Other Dominicans and Trinitarios would walk up to him, give him more food off their tray.... Other inmates giving him food, other Trinitarios and Dominican inmates.*
> Q: Did you observe these inmates do anything in particular with regard to the defendant leaving the table?
> A: When he got up and left they would get up and leave with him, and escort him out of the dining hall. They would either walk up to the rec yard. Sometimes they would walk down to the unit.
> Q: And as a result of Mr. Pepin's conduct and his relationship with these other members of Trinitarios did you do anything with regard to this information?
> A: *We just documented at our other facility that he could possibly be involved with the gang, the Trinitarios, and other Dominicans.*

Trial Tr. 2423-24, Oct. 29, 2008 (emphasis added).

4

On cross-examination, McBride conceded that the inference that the defendant was a member of the Trinitarios was based on his relationship with other Dominicans and the conduct of other prisoners rather than that of the defendant. The witness was not aware that the defendant engaged in any dangerous conduct related to gang activity:

> Q: I thought you said that either you suspected he was involved with the Trinitarios or that he was possibly involved in the Trinitarios?
> A: We suspected he was due to his actions, *who he was hanging with*.
> Q: As you described?
> A: Correct.
> Q: Now, apparently people in gangs in prison, according to your testimony, admit that they are in a particular gang?
> A: Some do, yes, when you confront them.
> Q: Mr. Pepin did not?
> A: No, he did not.
> Q: *Did you use the words "dangerous gang" or did Mr. Burwell [the government attorney] use the words "dangerous gang"?*
> A: *I use STG[Security Threat Group] or gang affiliation.*
> Q: *While Mr. Pepin was at Otisville [and] while you were at Otisville, did he do anything that could be described as dangerous in connection with gang activity, to your knowledge?*
> A: *Not to my knowledge, no.*

Trial Tr. 2434, Oct. 29, 2008 (emphasis added).

B. Testimony of Inmate X

Inmate X, an inmate at the Metropolitan Correctional Center (MCC) in New York City, testified about interactions that he had with the defendant that might indicate the defendant's gang membership and potential for violence. Inmate X recalled seeing the defendant with a makeshift "knife," fabricated from a bucket handle, and making statements indicating a desire to confront other inmates.

5

The defendant's alleged gang membership was also addressed in Inmate X's testimony. It was based upon the witness's observation of a tattooed dot on the defendant's neck and a conversation between them conducted in what Inmate X identified as gang code:

> A: As we began talking a little bit, because he was waiting for the phone, I asked him [] if he was a Son of Duarte.
> Q: Say that again?
> A: Son of Duarte, that is like a code, because I saw his código on his neck.... I asked him if he was Duarte's son.
> \*\*\*
> Q: What does the phrase Son of Duarte mean to you?
> A: For me, it's -- I come from prison, it's like a way of identifying if you're, you know, Trinitarios, if you into that organization. So as soon as I saw that código, and seeing what he's about, and I just assumed to ask him if he was a Son of Duarte and he said yes.
> Q: Let me break that down for a [] second. Son of Duarte, what or who is Duarte?
> A: *Duarte was like a president in the Dominican Republic.*
> Q: And Son of Duarte, does that expression mean something to you?
> A: Well, it means something like as far as being in prison. You know, Trinitarios is like an organization, some look at it like a gang, some look at it like an organization, and *it is for protection in the Dominican Republic, and it's a way in prison for, a way like Dominicans organize, come together.*
> We got people that are gang members or whatever, that's how we just unite. For example, me, I didn't – wasn't into that, I was neutral, but through other people that I met in jail, that's -- who wanted me to join the gang, those are some of the people that I know, they show me that code.
> If you want to know if somebody is a Trinitarios, you ask them, Are you a hijo de Duarte? Because that's like the code way. You don't tell the person, You're Trinitarios, and they're going so say yes. It doesn't work like that.
> Q: Why is it that you have to ask in code as opposed to just asking, Are you a Trinitarios? Why is that?
> \*\*\*
> Depending on where up at – we're at MCC, a lot of people cooperating, so if people are going to see you, you got to get a feel, you and SIS, they be on to you so you don't want to identify yourself so you use that as a code to identify, you know.

6

Trial Tr. 2536-38, Oct. 30, 2008 (emphasis added).

The government admitted a photograph of the defendant's upper body. Govt. Exh. 1050C. The witness offered some clarification as to the meaning of the "código," or code – that is, the dot tattooed on the defendant's neck.

> Q: [Inmate X], do you see the photograph on the screen?
> A: Yes.
> Q: I want to direct you to the portion of the photograph that shows the defendant's neck. Do you see that?
> A: Yes.
> Q: Do you see the spot on the neck?
> A: Yes.
> Q: Is that [the] código or code that you were referring to earlier?
> A: Yes.
> \*\*\*
> Q: What did you believe that meant when you first saw it?
> A: I believed that meant a código, code.
> Q: And what specifically?
> \*\*\*
> A: When you have a código -- in prison, when you have a código like that, you have it for a reason, you have to have done something either good or bad to have that there, you know.
> \*\*\*
> Q: Why do you believe -- let me ask you this. How long have you been in prison?
> A: For almost six years.
> Q: Have you seen other códigos before?
> A: Yes.

Trial Tr. 2540-41, Oct. 30, 2008.

Inmate X further described conversations about the defendant being a "Son of Duarte" and his knowledge of Dominicans and Trinitario gang members in prison.

> Q: I believe you said awhile ago that Pepin responded to your question about being a hijo de Duarte, correct?
> A: Yes.
> Q: What was his answer?
> A: He looked at me and he said yes.
> Q: Let me ask you, *are you Dominican*?

7

> A: Half.
> Q: Are you part of the Trinitarios?
> A: No.
> Q: Have you met *other Dominicans in prison*?
> A: Yes.
> ***
> Q: Is every *Dominican in prison* a member of the Trinitarios?
> A: No.
> Q: Is it true that, the converse, *there are many people from the Dominican Republic in prison* who aren't Trinitarios; is that correct?
> A: Yes.

Trial Tr. 2542, Oct. 30, 2008 (emphasis added).

On cross examination regarding the gang-related symbolism of the defendant's tattoo, Inmate X testified that he knew many Trinitarios without such a marking:

> Q: Do you remember that this morning you talked about Mr. Pepin and the fact that he has a dot on his neck?
> A: Yes.
> Q: Do you know when that dot was put on his neck?
> A: No.
> Q: And do you know other Trinitarios -- do you know any Trinitarios at MCC?
> A: Yes.
> Q: Do they have the same dot?
> A: No.
> Q: How about Ray Brook, do you know any so-called Trinitarios at Ray Brook?
> A: Yes.
> Q: And do they have the same dot?
> A: They don't have it there, no.

Trial Tr. 2619, Oct. 30, 2008.

Defense counsel inquired with respect to the nature of the Trinitarios generally casting doubt on whether the Trinitarios should be considered a dangerous prison gang:

> Q: Did you say when you were asked about the Trinitarios, that they were either a gang or an organization?

8

> A: In some places they are considered a gang and in other places an organization. It depends who's in charge in that particular place.
> Q: [I]s it just a difference in name?
> A: What do you mean?
> Q: In other words, when you say "gang," what's the difference between a gang and an organization?
> A: Well, in some places they are called an organization because they are an organization that has the function of keeping peace and people getting along. In other places they are called gangs because they are organized to defend themselves against other gangs, the Latin Kings or Bloods and others.
> Q: So in some institutions the Trinitarios are set up to keep the peace, would that be fair to say?
> A: Yes. For instance, in some places they are organized to have peace and also *to welcome Dominicans* that come into that particular place[] and they give them the option of either being neutral or becoming a Trinitarios. In some other places, *when Dominicans get there*, they either have to become Trinitarios or they have to leave the compound. So they have to go into the hole until the institution gives them a transfer to go to another institution.
> Q: When you say neutral would you explain to us what it means to be neutral?
> A: Neutral means that you are not part of any gang or any organization, meaning you are neutral. You are on your own and you get along with everybody.
> Q: Well, do any gangs force people to be members of those gangs?
> A: Sure, all the time.

Trial Tr. 2620-21, Oct. 30, 2008 (emphasis added).

C. Testimony of Dr. Michael Welner

Dr. Michael Welner, the government's psychological expert, did not have any direct knowledge of defendant's involvement in a prison gang. Instead, he dismissingly evaluated the defendant's explanation of his tattoos.

> Q: Did you actually find some of his responses to be absurd, I think is the word you used?
> A: There were a few. There were a few that -- there were a few that -- look, you do an interview. Sometimes people will tell you things that are surprising and you reflect on it and you say this is

9

> just another viewpoint, maybe this person has a different way of
> looking at things. But then occasionally you get answers that even
> if you see things from the perspective of the person taking it at face
> value, you would have to be a fool to take it at face value.
> Just as an example of this. We were looking at his tattoos that he
> has on different parts of his body. I had heard about them from his
> daughter whom I had spoken about, and then I later saw pictures
> from a previous visit, and so when we took a look at his tattoos, he
> told me that the reason that he had these tattoos put on was for
> cosmetic reasons, because they looked attractive. Then he ended
> ... by telling me, "swear to God," or something of the sort. So it's
> ludicrous.

Trial Tr. 2680-81, Oct. 30, 2008.

Dr. Welner returned to the subject in the context of his interview with the defendant's daughter, who had conveyed her understanding of her father's gang involvement:

> Q: Can you explain what it was about with these tattoos that made
> you believe that his comments were absurd?
> A: I first became aware of these tattoos when I was speaking with
> his daughter, Jared, who said that the last time that she had seen
> him was three years ago and that when she went to see him that he
> had these tattoos on his body and that he had explained to her that
> he had been a member of the Latin Kings but he changed
> membership and got these tattoos when he was a member of a new
> gang, which he joined because they did things, and that he
> specifically referenced these tattoos as dots that he would get every
> time that he ... did a beating. Now that impressed me because
> when we sat down in our interview, he said that he got these
> tattoos for cosmetic reasons because they would look attractive and
> I found it inconceivable that he would represent an innocuous,
> benign reason to me and then tell his 14-year-old daughter that he
> got it when he was in a gang, somebody that he might be more
> impressed -- or more interested in making an impression, a benign
> impression than a psychiatrist.

Trial Tr. 2727-29, Oct. 31, 2008.

On cross-examination, it became clear that the defendant's daughter had indicated to Dr. Welner her understanding that her father was a member of the MS-13 gang, not the Trinitarios.

10

Trial Tr. 2794-95, Oct. 31, 2008. The court cautioned the jury that the defendant's daughter's statements could not be used as independent evidence that the defendant was a member of a gang. Trial Tr. 2728-29, Oct. 31, 2008.

Dr. Welner also suggested the defendant's participation – and leadership position – in the Trinitarios: "[A]ccording to information supplied to me as part of the discovery file and a discussion of his activities in jail, in custody, that the specific reason that he was given a leadership place in the Trinitarios was because he was a man of action." Trial Tr. 2759, Oct. 31, 2008. The court again instructed the jury that Dr. Welner's testimony "is not evidence that [the defendant] was a member of the Trinitarios." *Id.*

III. Application of Law

A. Evidentiary Rule for the Penalty Phase

At the penalty phase, "information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). "[U]nder the FDPA [s]tandard, judges continue their role as evidentiary gatekeepers [at the penalty phase] and, pursuant to the balancing test set forth in § 3593(c), retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair." *United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004) (citations, internal quotation marks, and brackets omitted).

The court's authority to exclude probative evidence based on possible prejudice in capital sentencing proceedings is greater than it would be in trials generally. *See United States v. Pepin*, No. 04-156, *Memorandum and Order: Sentencing Phase Jury – Excluding Evidence form Guilt*

*Phase*, Docket Entry No. 611, Nov. 4, 2008. Section 3593 obligates the trial court to vigilantly identify and exclude evidence that might have a prejudicial effect on the defendant. *Compare* 18 U.S.C. § 3593(c) ("[evidence in the penalty phase] may be excluded if its probative value is *outweighed* by the danger of creating unfair prejudice, confusing the issues, or misleading the jury") (emphasis added) *with* Fed. R. Evid. 403 ("evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice") (emphasis added); *see also United States v. Sampson*, 335 F. Supp. 2d 166, 177 (D. Mass. 2004) (finding that the FDPA's penalty phase provisions confer greater power to exclude prejudicial evidence than does Rule 403 of the Federal Rules of Evidence).

Courts have "recognized the substantial risk of unfair prejudice attached to gang affiliation evidence, noting such evidence is likely to be damaging to a defendant in the eyes of the jury." *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996) (internal quotations omitted); *see also Blackmon v. Booker*, 312 F. Supp. 2d 874, 886 (E.D. Mich. 2004) (rev'd on other grounds) (finding that gang-related testimony with "limited probative value ... unduly prejudiced [the defendant,] as it preyed on the jurors' emotions and invoked their negative feelings about gangs in our society"). *But cf. Irvin*, 87 F.3d at 864 (probative value of gang affiliation evidence may in some cases warrant its admission over claims of prejudice); *Freeman v. United States*, 689 A.2d 575, 582 (D.C. Cir. 1997) (allowing evidence of association with others when it was relevant and sufficiently probative to outweigh any prejudice to the defendant).

Deciding whether the jury may find that the defendant is or was a member of a dangerous prison gang requires balancing the evidence's probative value and prejudicial impact under the more prejudice-averse evidentiary rule in the FDPA. 18 U.S.C. § 3593(c). A judgment should

12

be made as to whether "evidence of gang affiliation ... tend[s] to prove an element of the charged offense," *United States v. Nelson*, 103 F. Supp. 2d 512, 514 (N.D.N.Y. 1999), which in this case would be the aggravating factor of future dangerousness.

A defendant's race, ethnicity, or national origin alone cannot implicate him as a prison gang member. *See* Part III.B, III.C, *infra*. The court's analysis of the government's evidence of the defendant's gang membership, excluding all evidence that relies on inferences based on race, ethnicity, or nationality, leads to the conclusion that the evidence lacks the reliability and sufficiency necessary to permit the jury to conclude that the defendant is a gang member and that this finding supports the aggravating factor of future dangerousness.

### 1. Defendant's Association with Trinitarios and Dominicans as Evidence of Gang Membership

The government's evidence that the defendant is a member of the Trinitarios comes from two witnesses who have had contact with the defendant in the prison setting: SIS Officer McBride and Inmate X, a fellow inmate. McBride admitted that he lacked direct knowledge about the defendant's membership in a prison gang. His testimony that the defendant may have been a member of the Trinitarios was based on the defendant's nationality and that of the inmates with whom he associated who were of Dominican background and, in some instances, were gang members. The witness's perceptions were based largely upon his conflation of Dominican inmates and Trinitarios gang members. *See, e.g.*, Trial Tr. 2423 ("Other Dominicans and Trinitarios would walk up to him, give him more food off their tray)"; Trial Tr. 2424 ("We just documented at our other facility that he could possibly be involved with the gang, the Trinitarios, and other Dominicans."). Such evidence relies significantly on the nationality of the defendant and other prisoners.

13

Inmate X's testimony implicating the defendant's gang affiliation was based in part on the defendant's affirmative response to Inmate X's question about whether he was a "Son of Duarte," a possible reference to Juan Pablo Duarte, the founder of the Dominican Republic. *See* Frank Moya Pons, *The Dominican Republic: A National History* (Hispaniola Books 1995). *See also* Trial Tr. 2938, Nov. 3, 2008 (testimony about defendant's desires as a young man to be a pilot and to fly under the Duarte Bridge in the Dominican Republic). This evidence, based primarily on the defendant's nationality, is inadequate to support finding gang membership of the defendant.

Inmates regularly seek companionship and group identification in prison, often (but not uniformly) with individuals who have a similar ethnic, cultural, or linguistic background. McBride and Inmate X offered no reliable evidence of the defendant's involvement in the Trinitarios. McBride's testimony that other Dominican inmates – including some alleged Trinitarios – would give the defendant some of their food in the cafeteria hall provides essentially no probative evidence that the defendant was a leader or member in a prison gang. It suggests a misguided respect by young criminals for an older inmate with a known reputation as a killer in the drug trade.

Absent an inference based on the defendant's and his peers' Dominican background, there is insufficient evidence supporting a finding of the defendant's gang membership.

2. Tattoos as Evidence of Gang Membership

Inmate X testified about a single dot tattoo he saw on the defendant's neck, which may have been a "código," or code, identifying the defendant as a member of the Trinitarios. *See also* Govt. Exh. 1050C (picture of defendant's neck). His testimony offered no clear evidence that

the dot indicates gang membership. Instead, he opined that "[w]hen you have a código – in prison, when you have a código like that, you have it for a reason, you have to have done something either good or bad to have that there." Trial Tr. 2540-41, Oct. 30, 2008. The witness did state that he asked the defendant if he was a "son of Duarte" after seeing "his código on his neck," to which the defendant said "yes." Trial Tr. 2536-37, Oct. 30, 2008. But Inmate X later explained that he did not know when and why the defendant had gotten the dot tattoo. He conceded that he had encountered many other prison inmates he knew as Trinitarios who did not have such a "código." Trial Tr. 2619, Oct. 30, 2008.

Evidence that the defendant's dot tattoo indicates his affiliation in the Trinitarios or any other prison gang lacks sufficient reliability and probative force to allow a capital sentencing phase jury to consider it as evidence of gang membership.

### 3. Gang Membership as Evidence of Future Dangerousness

There is doubt as to whether the evidence about the Trinitarios gang itself is sufficient to permit the jury to consider whether the defendant's Trinitarios gang membership – if he is in fact a member – would increase his future dangerousness. McBride refused to categorize the Trinitarios as a "dangerous gang." Trial Tr. 2434, Oct. 29, 2008. Inmate X testified that the Trinitarios may serve either as a peaceful social organization or as a violent gang:

> [I]in some places [the Trinitarios] are called an organization because they are an organization that has the function of keeping peace and people getting along. In other places they are called gangs because they are organized to defend themselves against other gangs.... [I]n some places they are organized to have peace and also to welcome Dominicans that come into that particular place[] and they give them the option of either being neutral or becoming a Trinitarios.

Trial Tr. 2620-21, Oct. 30, 2008.

15

The testimony does not indicate that the Trinitarios are uniformly violent or dangerous. It does not provide support for the proposition that any affiliation the defendant may have had with possible members of the Trinitarios gang would increase his future dangerousness. This conclusion supports the court's decision to instruct the jury not to find the defendant to be a gang member.

B. Race, Ethnicity, or National Origin as a Proxy for Dangerous Gang Activity

"Discrimination on the basis of race is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). *See also McMillan v. City of New York*, No. 08-2887, 2008 WL 4555550 (E.D.N.Y. October 14, 2008) (finding that equal protection and due process rights weigh against reliance on race or ethnicity). "Because of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." *McClesky v. Kemp*, 481 U.S. 279, 309 (1987) (citing *Batson v. Kentucky*, 476 U.S. 79, 85 (1986)). "Racial classifications 'threaten to stigmatize individuals by reasons of their membership in a racial group.'" *Johnson v. California*, 543 U.S. 499, 507 (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (holding that the use of racial categories to segregate state prisoners is subject to strict scrutiny). *See also* Sarah Spiegel, Comment, *Prison "Race Riots": An Easy Case for Segregation?* 95 Calif. L. Rev. 2261 (2007) (attacking assumptions used to justify the use of racial classifications in penal policy-making).

Use of categories based on race, ethnicity, or national origin as evidence of the defendant's participation in dangerous gang activity would violate the equal protection clause of the Fourteenth Amendment. *See Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (holding that the

provisions of the Fourteenth Amendment are not confined to the protection of citizens but "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality"). "When government officials are permitted to use race [or ethnicity and national origin] as a proxy for gang membership and violence ... society as a whole suffers." *Johnson*, 543 U.S. at 511.

The defendant's equal protection rights weigh against allowing an inference that "an inmate's race is a proxy for gang membership, and [that] gang membership is a proxy for violence." *Johnson*, 543 U.S. at 517 (Stevens, J., dissenting). The courts "should give no credence to such cynical, reflexive conclusions about race." *Id.* at 519. "The legal system does not work fairly and with due process if one class of [individuals] is unduly burdened ... through the application of inappropriate 'race'-based statistics." *McMillan*, 2008 WL 4555550, at *10. Preventing such a race-based inference in "compliance with the Fourteenth Amendment's ban on racial discrimination ... bolsters the legitimacy of the entire criminal justice system." *Johnson*, 543 U.S. at 510-11 (2005).

C. Special Precaution to Ensure Against Discrimination in the Sentencing Decision

The FDPA mandates a "special precaution to ensure against discrimination" in the jury's determination to impose a sentence of death or life imprisonment without release:

> "In a hearing held before a jury, *the court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant* or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be. The jury, upon return of a finding under subsection (e), shall also return to the court a

17

> certificate, signed by each juror, that consideration of the race,
> color, religious beliefs, national origin, or sex of the defendant or
> any victim was not involved in reaching his or her individual
> decision and that the individual juror would have made the same
> recommendation regarding a sentence for the crime in question no
> matter what the race, color, religious beliefs, national origin, or sex
> of the defendant or any victim may be."

18 U.S.C. § 3593(f) (emphasis added).

This explicit statutory protection emphasizes the importance of preventing evidence and inferences based on race, ethnicity, or national origin. The jury may not "consider the race, color, religious beliefs, national origin, or sex of the defendant" in deciding a sentence, which requires considering the presence and weight of aggravating and mitigating factors. *Id.*

Due process and equal protection require that inferences based on race, ethnicity, or nationality be excluded at trial so that the court does not create arbitrary and irrational state action. *McMillan*, 2008 WL 4555550, at *10. *Cf. Brinkerhoff-Faris Trust & Savings Co. v. Hill*, 281 U.S. 673, 680 (1930) ("federal guaranty of due process extends to state action through its judicial ... branch of government"); *Johnson*, 543 U.S. at 507.

Safeguarding a capital defendant's right to a sentencing decision without discriminatory ethnic considerations obligates the court to provide a jury instruction stating that "the jury may not find that people from the Dominican Republic are more or less dangerous than other people in prison. The jury may not find that people from the Dominican Republic are more or less likely than other people to be members of a gang." *See* Trial Tr. 2882, Oct. 31, 2008. *See* Part I, *supra.*

The need for a jury instruction that "the jury may not find that the defendant was or is a member of the Trinitarios," *id.*, is underscored by the FDPA's "special precaution to ensure

18

against discrimination" provision. 18 U.S.C. § 3593(f). The government's evidence that the defendant is a member of a dangerous prison gang called the Trinitarios is circumstantial, indirect, and unreliable. Its prejudicial impact on the defendant will be greater than its probative force with respect to the aggravating factor of future dangerousness.

D. Restricting the Role of Expert Witnesses as to Gang Membership

In *United States v. Mejia*, the defendant successfully argued that the government's law enforcement expert could not testify to specific facts based on hearsay and otherwise unreliable or inadmissible evidence. The Court of Appeals for the Second Circuit defined the limitations of such expert testimony:

> When the government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those [] experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense.

No. 05-2856, 2008 WL 4459289, *8 (2d Cir. Oct. 6, 2008).

Although *Mejia* addressed a law enforcement expert's overreaching testimony, the same principle applies to a psychologist. The court will not permit the government's expert – Dr. Welner – to present "communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." *Id.* at *16 (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)). *See also Crawford v. Washington*, 541 U.S. 36, 50-51 (2004) (holding that the Confrontation Clause providing the defendant the right to confront and cross-examine witnesses against him applies not only to in-court testimony, but also to out-of-court statements introduced at trial, regardless of admissibility of statements under the rules of evidence). Such expert testimony may be allowed only if it is

19

"of a type reasonably relied upon by experts in [his or her] particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 702. The otherwise inadmissible facts may be "disclosed to the jury by the [expert if] the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." *Id. See also Mejia*, 2008 WL 4459289, at *8 ("The Government cannot satisfy its burden of proof by taking the easy route of calling an 'expert' whose expertise happens to be the defendant"). Here the prejudicial effect far outweighs the probative of force of the hearsay-based conclusions of Dr. Welner.

A limiting instruction to the jury during Dr. Welner's testimony emphasized that the gang-related testimony was to be considered only to gain an understanding of the expert's conclusions, but not as evidence of the defendant's membership in a prison gang.

IV. Conclusion

The three-part jury instruction set out in Part I, *supra*, is necessary and appropriate. It will be given to the jury.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: Brooklyn, New York
November 5, 2008